Rick PRIME, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–203.

Supreme Court of Wyoming.

Jan. 6, 1989.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Julie D. Naylor, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Senior Asst. Atty. Gen., and Terry L. Armitage, Asst. Atty. Gen., Cheyenne, for appellee.

Before CARDINE, C.J., THOMAS, URBIGKIT and MACY, JJ., and BROWN, J., Retired.

THOMAS, Justice.

In the context of its peculiar facts, leading to a conviction of aggravated robbery in violation of § 6–2–401(c)(ii), W.S.1977 (June 1983 Repl.),[1] this case presents ques-

1. Section 6–2–401, W.S.1977 (June 1983 Repl.), provides, in pertinent part:

tions previously addressed by this court. Error is asserted by Rick Prime because the other participant in the robbery was brought before the jury and, at that time, asserted his constitutional privilege not to testify by refusing to take the oath of a witness. Additional errors are asserted attributable to the failure to provide counsel in connection with voice exemplars and a photographic array by means of which identifications were made by some witnesses; the use of testimony from witnesses who arguably had been hypnotized for the purpose of attempting to enhance their recollections; and the failure to give certain proffered defense instructions. We conclude that these claims of error are controlled by prior cases decided by this court, and either no error was committed or, in the context of all the circumstances, any error was not prejudicial. The judgment and sentence entered in the district court is affirmed.

The appellant, Rick Prime (Prime), states the following issues in his brief:

"I. Whether it was error for the trial court to allow the prosecution to call Darwin Haselhuhn as a witness knowing that he would exercise his Fifth Amendment right to refuse to testify.

"II. Whether it was error to allow evidence of unduly prejudicial voice and photographic identifications to go to the jury.

"III. Whether hypnotically enhanced testimony should be allowed in a criminal trial.

"IV. Whether the court erred in refusing two jury instructions and in refusing to allow trial counsel to present argument on those instructions."

The State of Wyoming restates the same issues in this way:'

"I. Was there error in witness Haselhuhn's exercise of his Fifth Amendment right to refuse to testify?

"II. Was there error in the procedures for voice and photographic identification?

"III. Is hypnotically enhanced testimony permissible in a criminal trial?

"IV. Did the trial court err in refusing appellant's proffered jury instructions?"

On the night of April 21, 1984, the assistant manager and a clerk at the Safeway Store in Green River, Wyoming were the victims of an armed robbery. The store was closed and locked at approximately 10:00 P.M. that night, and the rest of the store employees had departed. The assistant manager and the clerk were counting the money from the several checkout counter tills when the assistant manager noticed two men approaching down one of the aisles. The men were wearing masks and were armed, one with a sawed-off shotgun and the other with a large knife. The first was attired in a dark coat or jacket and a ski-type mask, the other wore a green coat or jacket with a Halloween style mask that had long black hair and a face described as orange/yellow. These two men, after threatening the assistant manager and the clerk, entered a booth that served as an office and proceeded to empty the tills into a white bag. The man with the shotgun forced the assistant manager to open the bottom safe by prodding him with the shotgun.

The robbers made the assistant manager and the clerk accompany them into a back storeroom where they then tied their hands and feet and covered their eyes with duct tape. The robber wearing the Halloween

"(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:
"(i) Inflicts bodily injury upon another; or
"(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury.
* * * * * *
"(c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:

"(i) Intentionally inflicts or attempts to inflict serious bodily injury; or
"(ii) Uses or exhibits a deadly weapon or a simulated deadly weapon."
Section 6–3–402, W.S.1977 (June 1983 Repl.), provides, in pertinent part:
"(a) A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny."

mask removed it at this juncture, and the assistant manager, by tilting his head backward, was able to peer beneath the tape and see this individual. At trial, the assistant manager testified that he observed a man with long blondish-brown hair wearing a white tee shirt and gold-rim glasses.

The robbers then left the store and, after freeing himself, the assistant manager promptly reported the robbery to the police. Both the assistant manager and the clerk furnished statements to investigating officers that same evening at the scene of the crime. The assistant manager advised the officers that he recognized the man whom he had seen as a member of the crew who cleaned the floors in the store. He did not know the man's name but, when shown a photographic array including a picture of Darwin Haselhuhn, he identified him as the man he had seen. Later, when he saw Haselhuhn in person at the preliminary examination, he positively identified him as the robber. Haselhuhn was convicted of this armed robbery, and that conviction was affirmed by this court in *Haselhuhn v. State*, 727 P.2d 280 (Wyo.1986), cert. denied 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987).

The assistant manager and the clerk both explained to the investigating officers that only one of the robbers spoke during the course of the robbery. The investigating officers then obtained a tape with several voice exemplars, the last of which was Prime's voice. The voice exemplars were then played to these witnesses, and the assistant manager identified Prime's voice as the voice of the other robber. The store clerk selected the third exemplar and the Prime exemplar as being similar to the voice that she had heard at the robbery.

During the course of the investigation, the police officers arranged hypnotic sessions for the assistant manager and the store clerk. At trial, the assistant manager testified that he did not think he ever had been under hypnosis, and he said that his identification was not assisted by anything that occurred during the hypnotic session. The clerk, who had testified at Haselhuhn's trial, did not testify in Prime's

case, but a statement that she had made to the police officers was received into evidence. Prime called an expert witness in his defense who explained the difficulties and problems with hypnosis and the possible results in terms of effect upon the recollection of a witness.

The evidence against Prime, in addition to that of the two victims of the robbery, encompassed in-court identification of Haselhuhn by the assistant manager and other witnesses; Prime's association with Haselhuhn; his claim that he had spent the entire evening of April 21, 1984 with Haselhuhn; and incriminating allusions to the robbery which Prime and Haselhuhn had made to other witnesses who testified. In addition, Prime was identified as having entered the Safeway Store between 9:30 and 10:00 P.M. on the night of the robbery. That witness, and others, had seen Haselhuhn enter the store also, but no one had seen either of them leave.

During the course of the trial, the record reflects that when Darwin Haselhuhn was presented in the courtroom, the following occurred:

"[COUNTY ATTORNEY]: State calls Darwin Haselhuhn as an adverse witness.

"THE COURT: Have you been sworn?

"MR. HASELHUHN: No, I haven't, Your Honor. I decline to be sworn in and I decline to answer any questions.

"THE COURT: You'll be sworn in, mister. Now raise your right hand.

"MR. HASELHUHN: (No response).

"THE COURT: Raise your right hand.

"MR. HASELHUHN: I decline to be sworn in, Your Honor.

"THE COURT: All right. I find you in direct contempt of Court. I remand you to the custody of the Sheriff to be held there until you answer and/or sworn or sentenced otherwise; is that clear?

"MR. HASELHUHN: That's clear, Your Honor.

"THE COURT: All right. Take him out."

Following this colloquy, a motion for a mistrial was made on behalf of Prime claiming that the circumstances were preju-

dicial. That motion was denied, and the court then gave the following advice to the jury:

"THE COURT: Ladies and gentlemen, the fact that I found Mr. Haselhuhn in contempt of Court and remanded him to the custody of the Sheriff, has no bearing on the innocence or guilt of Mr. Prime. You will not consider it. You may continue."

The appearance in the courtroom had been preceded by a conference in chambers in which the court granted immunity to Haselhuhn from the use of his testimony against him, and Haselhuhn affirmed his position that he would not testify because of possible prejudice relating to federal charges and other charges against him. At that conference, Prime's counsel also complained about the loss of any opportunity to cross-examine.

■ We address, first, the claim of error arising out of the circumstances in which Haselhuhn was presented before the jury and exercised his right not to testify by refusing to be sworn as a witness. In substance, the inverse of this situation occurred at Haselhuhn's trial when Prime, upon being presented for the administration of the oath, advised the court in front of the jury that he would refuse to testify. The court there addressed the claim that Haselhuhn had been deprived of his right of confrontation because he was not permitted to cross-examine Prime with respect to conduct which was perceived by Haselhuhn as being equivalent to testimony. We there explained that there was no violation of the right of confrontation under those circumstances.

In that case, like this case, Haselhuhn moved for a mistrial, but he did not request that a cautionary instruction be given to the jury. In this case, Prime moved for a mistrial, but he made no complaint with respect to the advice which the district court gave the jury. We reiterate our statement in *Haselhuhn*, 727 P.2d at 286, that "such incidents should be avoided in the trial of a case," and we remind counsel and the trial bench that the record can be made outside of the presence of the jury

which avoids any claim of prejudice. In this instance, like *Haselhuhn*, 727 P.2d at 280, we conclude that what occurred is not a ground for reversal because, in the context of the trial, this event did not prejudice Prime. The trial court did give a cautionary instruction which, in effect, advised the jury that it should not consider the appearance of Haselhuhn as relating to the guilt or innocence of Prime. Furthermore, Haselhuhn had been presented in court several times prior to this event and identified by various witnesses. The jury had no way of knowing that Haselhuhn already had been found guilty of the crime, and what occurred was what would be expected of an individual who had been identified by witnesses at the trial as the other robber. In somewhat similar circumstances, federal appellate courts have concluded that prejudice was avoided by cautionary instructions to the jury. *Labbe v. Berman*, 621 F.2d 26 (1st Cir.1980); *United States v. Watson*, 591 F.2d 1058 (5th Cir.1979), cert. denied 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979). We conclude that no error occurred with respect to Haselhuhn's presentation as a witness.

■ Prime argues in his next claim of error that he was entitled to the assistance of counsel in connection with the photographic array and the voice exemplars which were utilized to assist in the identification of the perpetrators of the robbery. Prime invites the court to extend the right to counsel to preindictment stages which would include the preparation of the photographic array and the voice exemplars. Counsel is not required, in such instances, by the United States Constitution, *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), because that right attaches only upon the commencement of adversary judicial proceedings. *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932). This same rule has been espoused by this court and applied to claims arising under the Wyoming Constitution. *Charpentier v. State*, 736 P.2d 724 (Wyo.1987); *State v. Heiner*, 683 P.2d 629 (Wyo.1984); *Brown v. State*, 661 P.2d 1024 (Wyo.1983); *Auclair v. State*, 660 P.2d 1156 (Wyo.1983). We are not

persuaded to overrule these authorities, and we find no error with respect to the claim of right to counsel in connection with the pre-indictment identification proceedings.

Prime argues, in addition, that these identification procedures did not meet the requirements of due process articulated in *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.2d 183, 25 A.L.R.2d 1396 (1952). We conclude that there was no abuse of discretion by the trial court in permitting the introduction of the photographic array. The photographic array was substantially similar to the one which was utilized in *McDaniel v. State*, 632 P.2d 534 (Wyo.1981), as to which we concluded:

> " * * * [T]o the reasonable person it is just a photograph presented to support the testimony. Admission of evidence is within the sound discretion of the trial court, and absent a clear abuse of discretion will not be disturbed." *McDaniel*, 632 P.2d at 536.

We have examined the record to determine if the totality of the circumstances was suggestive, and we conclude that it was not. Both the assistant manager and the clerk fulfilled the criteria articulated in *Reinholt v. State*, 601 P.2d 1311 (Wyo. 1979), as adopted in *Alberts v. State*, 642 P.2d 447 (Wyo.1982), and also *Sears v. State*, 632 P.2d 946 (Wyo.1981). Both witnesses had ample opportunity to view and listen to the robbers. Their attention definitely was focused upon these individuals. They gave accurate descriptions of the robbers prior to the presentation of the photographic array. They both were rather certain of the identification at the time of personal confrontation, and the time between the personal confrontation and the crime was not unduly enlarged. With respect to the voice exemplars, only one of the robbers spoke during the robbery, and the witnesses were both clear on their identification of that exemplar. We hold that no error occurred in the admission of the photographic array or the voice exemplars at trial. Prime's claim of error with respect to the testimony of witnesses who had been hypnotized is substantially the same as that presented by Haselhuhn in his appeal. The only difference is that Prime had ample opportunity to be aware of the hypnotic session and, in fact, did produce expert testimony addressed to the vagaries and problems of hypnosis. The major development in the law since the case of *Haselhuhn v. State*, supra, was decided is the decision of the Supreme Court of the United States in *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), which refused to approve a per se rule prohibiting testimony by a defendant who had been hypnotized. The Supreme Court held that such a rule infringed upon the Sixth Amendment right of an accused to make his defense by presenting his version of the events in his own words. In the course of its opinion, the Supreme Court reviewed the status of state law generally with respect to witnesses who have been hypnotized, and the decision seems compatible with the position which has been espoused by this court in prior cases. Consequently, we adhere to the rule adopted in *Haselhuhn*, 727 P.2d at 280; *Pote v. State*, 695 P.2d 617 (Wyo.1985); *Gee v. State*, 662 P.2d 103 (Wyo.1983); and *Chapman v. State*, 638 P.2d 1280 (Wyo.1982). A witness who has been hypnotized is not incompetent and may testify. The circumstances surrounding the hypnosis can be presented to the jury, and the question is one of credibility.

Lastly, Prime complains of the failure to give two instructions which he contends set forth his theory of the case. Those requested instructions read:

#### "DEFENDANT'S PROPOSED INSTRUCTION # B

"A witness who has been hypnotized does not automatically become incompetent as a witness because of the hypnosis. His testimony, if believed by the jury, may be sufficiently convincing to persuade the decision; even though not corroborated or supported by other evidence.

"However, the jury should keep in mind that such testimony is always to be received with caution and weighed with

great care. You should subject such testimony to careful examination in the light of all the other evidence in the case. You ought not to convict upon such testimony alone, unless after a careful examination of such testimony, you are satisfied beyond a reasonable doubt of its reliability.

"Careful consideration must be given to the manner of the hypnosis in order to ascertain the testimony's reliability. You must assure yourselves that hypnotically enhanced testimony does not reflect suggested pseudo memories or fantasies that are accepted as real by the witness and hypnotist alike."

### "DEFENDANT'S PROPOSED INSTRUCTION # H

"One of the most important issues in this case is the identification of the Defendant as the perpetrator of the crime. The State has the burden of proving identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of his statement. However, you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the Defendant before you convict him. If you are not convinced beyond a reasonable doubt that the Defendant was the person who committed the crime, you must find the Defendant not guilty.

"Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later."

The court adequately advised the jury with respect to its prerogatives as to credibility and the burden of proof in other instructions. The proposed instructions by Prime are a skillful effort to induce the trial court to argue the case for the defense through its instructions.

 Our rule is that a court may refuse a requested instruction if it has been covered by other instructions, *Benson v. State*, 571 P.2d 595 (Wyo.1977). The court also properly may refuse instructions which are argumentative or unduly emphasize one aspect of the case. *Evans v. State*, 655 P.2d 1214 (Wyo.1982). We hold that these criteria were satisfied in this instance.

So far as Prime's argument is concerned that these instructions set forth his theory of the case, we do not accept that invitation. Not every matter of trial strategy or tactics constitutes the theory of the defendant's case. We recognize that Prime's theory was that the testimony of the hypnotized witnesses was suspect and was not entitled to any moment in the deliberations of the jury. Nevertheless, that is simply Prime's theory with respect to this aspect of the evidence; we do not perceive that it was his theory of the case. His theory of the case was that someone else, not Prime, committed this robbery. We eschew a rule that every instruction offered by a defendant must be given if he characterizes it as incorporating his theory of the case.

We hold that there was no prejudicial error with respect to any of the matters complained of by Prime. The judgment and sentence of the district court is affirmed.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Justice, dissenting.

This is the third appeal resulting from the Green River, Wyoming Safeway store robbery. In *Haselhuhn v. State*, 727 P.2d 280 (Wyo.1986), cert. denied 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987), (Haselhuhn I), the conviction of Darwin Haselhuhn was affirmed, in my opinion, in the face of most appalling trial circumstances. Next then *In re Contempt of Haselhuhn*, 740 P.2d 387 (Wyo.1987), (Haselhuhn II), he was called as a witness publicly before the jury under contended "use immunity" to testify against Rick Prime (Prime) in this case. After the grievous prejudice was committed in jury presentation upon his refusal to testify, he was found in contempt of court and thereafter sentenced for contempt, which decision was reversed by this court.

## 1. JURY SHOW-UP FOR NON-TESTIMONY PRIVILEGE PLEA

Now presented as the separate trial of the alleged co-conspirator, this appeal presents the outrageous results demonstrated in the *Engberg* death penalty case, *Engberg v. State*, 686 P.2d 541 (Wyo.), cert. denied 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984), pursued in *Haselhuhn I*, and now presented in full flower. These include questionable eye-witness identification and hypnotism, but more strikingly, trial process prejudice by presentation to the jury of a recalcitrant, recently convicted witness under suggestion of immunity.[1] Like *Haselhuhn I*, the skunk was thrown into the jury box by prosecutorial conduct, but it was a different skunk by forcing public appearance of an individual recently convicted and frequently named in trial testimony. The smell was amplified by the district court admonition which could only serve to increase the prejudice when the court said:

THE COURT: All right. I find you in direct contempt of Court. I remand you to the custody of the Sheriff to be held there until you answer and/or sworn or sentenced otherwise; is that clear?

MR. HASELHUHN: That's clear, Your Honor.

THE COURT: All right. Take him out.

And then, after mistrial was denied, the further emphasis afforded:

THE COURT: Ladies and gentlemen, the fact that I found Mr. Haselhuhn in contempt of Court and remanded him to the custody of the Sheriff, has no bearing on the innocence or guilt of Mr. Prime. You will not consider it. You may continue.

Sweetwater County, as a community with a medium-sized population and one major newspaper, belies any possibility that all one dozen of the sitting jurors had not been previously exposed to knowledge

---

1. I also have another serious concern from a speedy trial perspective, although not on issues argued below or presented here on appeal. With an offense that occurred on April 21, 1984, Prime was arrested on June 7, 1984, and was provided a preliminary hearing on June 25, 1984. His date of district court arraignment is not of record but apparently occurred on July 5, 1984. Motion to suppress, motion for preservation of evidence, motion in limine and motion to reveal agreements were filed July 6, 1984, with supporting memorandum filed December 12, 1984. A motion was filed December 27, 1984 by the prosecution for further time to respond up to and including January 10, 1985, which was apparently submitted ex parte and approved by order of the district court. The responsive brief was duly filed, and on January 22, 1985, the district court wrote counsel advising of some relief on the matter and that the prosecuting attorney would prepare an appropriate order which was never done. The prosecuting attorney filed a motion for trial setting on August 22, 1985, the case was then first set for trial April 8, 1986 and actually held on May 13, 1986, or slightly less than twenty-four months after the offense had occurred and slightly more than twenty-two months after arraignment in district court. Rule 204, Wyoming Uniform Rules for the District Courts provides:

(a) It is the responsibility of court and counsel to insure to each person charged with crime a speedy trial.

(b) A criminal charge shall be brought to trial within 120 days following the filing of information or indictment.

(c) The following periods shall be excluded in computing the time for trial:

(1) All proceedings related to the mental illness or deficiency of the defendant.

(2) Proceedings on another charge.

(3) Delay granted by the court pursuant to Section (d).

(4) The time between the dismissal and the refiling of the same charge.

(5) Delay occasioned by defendant's change of counsel or application therefor.

(d) Continuances may be granted as follows:

(1) On motion of defendant supported by affidavit of defendant and defendant's counsel.

(2) On motion of the prosecuting attorney or the court if:

(i) The defendant expressly consents; or

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(e) Upon receiving notice of possible delay the defendant shall show in writing how the delay may prejudice his defense.

(f) If the defendant is unavailable for any proceeding at which his presence is required, the time period shall begin anew upon defendant's being available.

At least, in this case, Prime was out on bond during the delayed trial period.

that Haselhuhn had been convicted for the Green River/Sweetwater County robbery. Prejudice in recalcitrant witness presentation to force privilege exercise publicly before the jury simply should not be acceptable and does not confine itself to equal protection and due process criteria of criminal prosecution. This constitutes the rankest character of prosecutorial prejudice and misconduct. *Johnigan v. State,* 482 S.W.2d 209 (Tex.Cr.App.1972).

I cannot, in repetition from Haselhuhn I, again re-emphasize sufficiently the disapproval I have for this tactic of engendered prejudice by procedure. I would repeat, as recently stated in *Corson v. State,* 766 P.2d 1155 (Wyo.1988) by a historical quotation from a great American jurist, Judge Jerome Frank:

> "A keen observer has said that 'next to perjury, prejudice is the main cause of miscarriages of justice.' If government counsel in a criminal suit is allowed to inflame the jurors by irrelevantly arousing their deepest prejudices, the jury may become in his hands a lethal weapon directed against defendants who may be innocent. He should not be permitted to summon that thirteenth juror, prejudice."

*State v. Beuke,* 30 Ohio St.3d 29, 526 N.E. 2d 274, 293 (1988) (petition for certiorari filed 10/31/88) (quoting from *United States v. Antonelli Fireworks Co.,* 155 F.2d 631, 659 (2d Cir.), cert. denied 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640, reh'g denied 329 U.S. 826, 67 S.Ct. 182, 91 L.Ed. 701 (1946)). If convictions are to be obtained on facts and not infused prejudice, there is no place in criminal trials for this procedure, and alternatively, there are proper avenues for the exercise of the right not to testify to be recorded out of the presence of the absorbent jury for effect in persuasive character. See *Lawrence v. State,* 257 Ga. 423, 360 S.E.2d 716 (1987) and *Adkins v. State,* 72 Md.App. 493, 531 A.2d 699 (1987), cert. granted 311 Md. 445, 535 A.2d 921 (1988).

## 2. EYE–WITNESS EXAMINATION

As the expression goes, this court has now dropped the second shoe in blindly ignoring solutions to the pervasive eye-wit-

ness identification danger resulting in opportunity for false conviction. In *Engberg,* the majority abjured use of the well-established expert witness and this court now rejects the use of the special instruction launched by *United States v. Telfaire,* 469 F.2d 552 (D.C.Cir.1972). Clearly, in context of minority-majority rejection of the well-established and thoughtfully presented Telfaire instruction, as well as denial of the usage of the expert witness as decreed in Engberg, this state moves back into a century long gone as following a minority of courts who do not recognize either logic or volume of literature on the eye-witness identification quandary.

## 3. HYPNOTIC INFUSED TESTIMONY

The errors in this record do not there end. The hypnotic activity is still not sanitized since first involved in *Engberg,* although at least progression occurred from *Haselhuhn I* in that the expert witness was now permitted. Citations of the court to *Rock v. Arkansas,* 434 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) does not strengthen the disingenuous posture compulsively continued for this jurisdiction. Comment, *Rock v. Kansas: An Individual Inquiry Approach to the Admissibility of Hypnotically Induced Testimony,* 37 Cath.U.L.Rev. 1171 (1988). Rock involved the constitutional right of a defendant to testify, as basic in constitutional protection to himself, and did not readjust the clearly apparent problems presented by possible hypnotic tampering of witnesses. At best, or at worst, even in the states affording a more liberal attitude in disapproval of possible alteration of testimony by hypnosis, the levels in *Haselhuhn I* and Prime here presented do not pass muster. Again, in finite regression, this state will stand far back from majority consensus in its present blindness to a recognized problem inflicting conviction process. *People v. Zayas,* 116 Ill.2d 574, 113 Ill.Dec. 315, 515 N.E.2d 124 (1987).

## 4. RIGHT TO COUNSEL

The fourth issue presented attends to the right to counsel when photographic dis-

plays and voice exemplars are used for witness identification. This is not the prearraignment, pre-counsel appointment question of initiation of right to counsel raised in the handwriting exemplar identification case of *Brunmeier v. State*, 733 P.2d 265 (Wyo.1987).[2] This appellate issue relates to the right of the defendant to be represented first when he is forced to testify against himself by speaking designed words and then a recording is used with other samples for identification. Likewise, where no time expediency was involved, the opportunity of counsel to be present to see what actually occurred when photographic show of identification processes were pursued simply cannot be rejected if the supposition of a real right to counsel is fairly permitted. Since representation had been secured, I would not find the process to be constitutionally distinguishable from the most recent review of right to counsel by the United States Supreme Court in *Satterwhite v. Texas*, — U.S. —, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), where examination of the charged individual by a psychiatrist was accomplished in the absence of his attorney.

It is apparent from examining the photographs and in listening to the tape that two features distinguished Prime. As to the photograph, any juror who has experience with criminal processes would have recognized an in-jail identification photograph when the name plate is hung by a chain from his neck, which chain can be clearly seen. The voice identification was also clearly identified since only this witness was given taped instructions as to what he was to say, while obviously such instructions as had been given to the other witnesses were not included on the tape excerpts. Had counsel for Prime been given the opportunity to be present at either incident or to examine the work product to be used, a clean up could simplistically have been provided so that the potentate of non-equivalency and unfairness would have been removed.

Recognizing the conviction to have been fueled and fertilized by what occurred: prejudice by procedure, hypnotism, denied instruction or expert testimony, and ignored post appointed right to effective assistance of counsel, I respectfully dissent from error absolving approval. I would reverse for retrial.

---

2. In brief, the State contends:

> In the case at bar, the photographic and voice identification procedures were executed before adversarial criminal proceedings were commenced against Appellant, therefore the Sixth Amendment right to counsel did not attach at the time of the identifications.

The offense occurred April 21, 1984, and on June 6, a criminal warrant for aggravated robbery was issued and executed on June 7. On June 11, Mr. Robert J. Reese had entered an appearance as counsel, since the record reflects that he was given copies of documentation except affidavit for arrest warrant. Preliminary hearing was held June 25, and Prime was bound over to district court. The preliminary hearing was obviously a contested proceeding. The district court information was signed and filed July 5, and motions to suppress voice identification and for preservation of evidence and motion in limine were served July 6. Two items of photographic identification were used: State's Exhibit 43, which is a collection of separate mug shots numbering six; and State's Exhibit 42, which is a photographic display including the photograph of Prime. It is simply not possible to tell from the record whether the photographic display was composed and then used for identification after Mr. Reese had been appointed to serve as counsel for Prime. As a matter of fact, the record does not even reflect how Mr. Reese came to be appointed.

A careful reading of the entire record as the transcripts then finally reveal that apparently the voice exemplars were played for the two principal witnesses on July 3, 1984, at a date substantially after counsel had been appointed and also after Prime had been bound over for trial to the district court. Clearly, no effort was made to permit defense counsel to either be available when the original search warrant exemplar was obtained from Prime, which date cannot be determined because the search warrant is not available, or when the identification session was conducted by presentation of the tape of the seven individuals to the two witnesses separately on July 3. Consequently, any general discussion in this context as defining an issue of the right to counsel prior to "commencement of adversarial criminal proceedings" against Prime has no factual validity in the record documentation.