**Dale Burton JONES, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**Ray KNOX, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

Nos. 88–94, 88–95.

Supreme Court of Wyoming.

July 3, 1989.

Michael J. Krampner, Casper, for appellant Jones; Fred R. Dollison, Sheridan, for appellant Knox. Argument presented by Messrs. Krampner and Dollison.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., Karen A. Byrne, Senior Asst. Atty. Gen., and Terry L. Armitage, Asst. Atty. Gen., for appellee. Argument presented by Mr. Armitage.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

CARDINE, Chief Justice.

In this case two witnesses were called before the jury with the court and prosecutor knowing beforehand that they would assert their Fifth Amendment right not to testify, and then the court instructed the jury to disregard the effect of their being called as witnesses.

Appellants Dale Burton Jones (Jones) and Ray Lamar Knox (Knox) were convicted by a jury of conspiracy to commit murder in the first degree in violation of W.S. 6-1-303 and 6-2-101. They each raise five essentially identical issues on appeal.

Jones inquires:

"1. Was reversible error committed by the trial court in allowing the prosecution to call as witnesses in the presences of the jury, persons whom the trial court and prosecution knew would exercise their Fifth Amendment right to remain silent?

"2. Did the trial court, by issuing orders based on ex parte motions of the prosecutor violate the Fourteenth Amendment due process rights of the appellant and demonstrate prejudice in fact against appellant?

"3. Did the trial court commit reversible error by allowing the prosecution to present evidence of numerous financial transactions, books, and records, which were irrelevant to the case?

"4. Did the trial court commit reversible error by denying appellant's motion

to suppress items seized pursuant to the July 2, 1987, search warrant, because the warrant was issued based on an affidavit which did not contain probable cause to believe that each of the items to be seized was at any one of the places to be searched?

"5. Even if no one of the errors committed by the trial court constituted reversible error, did the cumulative effect of the errors described above render the verdict improper, such that it should be reversed?"

Knox states the issues as:

"1. The district court committed a reversible error in permitting the prosecutor to call to the stand witnesses whom the court and the prosecutor knew were going to invoke valid privileges not to testify, solely to cause the witness to invoke the privilege to the prejudice of the appellant.

"2. The district court committed reversible error in admitting into evidence business and financial records of Keeler Konstruction, Inc., when the same had no connection to appellant.

"3. The district court committed reversible error in granting to the prosecutor ex-parte orders for the seizure of certain Mountain Bell telephone records without notice to counsel for appellant and in permitting the prosecutor to maintain a secret file for subpoenas of American Express records for which counsel for appellant was denied access.

"4. The district court committed reversible error in refusing to suppress as evidence items seized pursuant to a general warrant.

"5. Even if no single assigned error committed by the district court is deemed reversible, the cumulative effect of all the errors so prejudiced appellant that the matter ought to be reversed."

We reverse and remand their convictions for retrial.

In the early morning hours of June 29, 1987, Ray Vigil was attacked in his bed in the house owned by appellant Ray Knox at 1500 Leopard Street, Sheridan, Wyoming. Vigil's assailant, Roy Alma Young, Jr., entered Vigil's room and hit Vigil in the mouth with the butt of a pistol. A struggle ensued during which Young shot Vigil twice.

After being shot, Vigil was able to overpower Young. Vigil dragged Young from the bedroom to the kitchen where he telephoned for emergency assistance. The police responded and took Young into custody. A search of Young at the time of arrest yielded: $2,500 in hundred dollar bills; cigarettes; a cancelled airplane ticket; ammunition for a .22 calibre pistol; and a map of Wyoming.

Young was arrested and charged with burglary, attempted murder and being a habitual criminal. He declined to discuss the events surrounding the assault on Vigil with law enforcement officials until he had secured a plea agreement. After making a plea agreement, he related this story.

On June 28, 1987, while in Salt Lake City, Utah, Young received three phone calls from his cousin, appellant Knox. Knox asked Young if he would come to Sheridan, Wyoming, to "take care of a guy." Young understood from this conversation that the "guy" was blackmailing Knox's and Jones' employer, Keeler Konstruction, and the company's owner Alan Keeler. Young was to go to the Salt Lake City airport, pick up a ticket that would be waiting for him, and fly to Billings, Montana where he would be met by a man named "Dale" (later identified by Young as appellant Dale Jones), who would be dressed in a black four-button polo shirt and a black cap with the logo "Montana" across the front.

Young accepted the proposal, flew to Billings, and was met by the man named Dale. Dale Jones then drove Young to Sheridan. During the trip, he told Young that he was to kill Vigil and was to dispose of the body. Young said Jones gave him the pistol used in the assault, ammunition for the gun, various "cross top" amphetamines, and drew a schematic of the house at 1500 Leopard Street on a french fry carton. Upon arriving at 1500 Leopard Street, Jones showed Young into the house, pointed out Vigil's room, and then told him

to lie down in a separate room and to wait for at least one-half hour after Jones left to do the killing. After Jones left, Young fell asleep. Upon awakening an hour or so later, Young entered Vigil's room and assaulted and shot Vigil.

Young's statements to police led to the arrest of Jones and Knox. Preliminary hearings for Jones and Knox were held on August 7, 1987, and they were bound over to the district court. At their arraignments on August 19, 1987, Jones and Knox pled not guilty to the charges of conspiracy to commit murder in the first degree.

Young testified against appellants at trial after securing a plea bargain agreement for a reduced charge and sentence. Appellants were convicted of conspiracy to commit murder in the first degree after a five-day jury trial and were sentenced on February 22, 1988, to life imprisonment.

## I

■ The only issue we will resolve is whether it was reversible error for the trial court to permit the prosecution to call witnesses in the presence of the jury who the court and the prosecution knew would invoke the Fifth Amendment privilege not to testify. We hold that it was error and reverse.

The two witnesses who invoked the Fifth Amendment privilege not to testify were Alan Keeler and Nancy Haefner-Keeler. At the time of trial neither had been formally charged with the underlying conspiracy but were under investigation for illegal employment and tax activities not necessarily related to this case. Throughout preparation for the trial it was understood by the parties that the State's theory of the case was that Vigil was blackmailing Keeler Konstruction for unpaid wages and that elimination of this blackmail threat was the motive for the conspiracy to commit murder.

Very early in the proceedings the prosecution sent subpoenas to Alan Keeler and Nancy Haefner-Keeler, who was Alan Keeler's bookkeeper, making it clear they would be called as State's witnesses to testify against appellants as to the underlying conspiracy and as to their involvement in it. On December 3, 1987, Alan Keeler filed a Motion to Quash Subpoena because of the ongoing investigation into his business practices. In his motion, Alan Keeler stated: "That because Alan Keeler is the target or potential target of numerous investigations, in all likelihood any questions asked during the course of the trial may be answered by Alan Keeler invoking the Fifth Amendment privilege." On December 7, 1987, Nancy Haefner-Keeler informed the prosecution that "if Nancy Haefner-Keeler is called to testify in the conspiracy to murder trial that is presently ongoing, it is her intentions to plead the Fifth Amendment in many areas of anticipated questioning."

Prior to their actually being called, the trial court and the prosecutor were again informed by counsel that the witnesses intended to claim the Fifth Amendment privilege not to testify if called to the stand. At a hearing in chambers on the witnesses' motions to quash their subpoenas to testify, it was emphatically and clearly indicated that the witnesses were going to claim their privilege and would refuse to testify. The prosecutor then agreed that the witnesses should be called outside the presence of the jury to insure that the invocation of their Fifth Amendment right would not prejudice appellants. However, he also expressed some concern that defense counsel might argue in closing that the failure to produce these witnesses diminished the credibility of the State's conspiracy theory. He suggested that the concerns of all parties could best be met by calling the witnesses outside of the jury's presence and limiting appellants' prospective reference to their absence by an order in limine. In lieu of issuing such an order, the trial court indicated it would permit the witnesses to be called before the jury unless appellants agreed not to argue the State's failure to call them. Some confusion arose as to the scope of argument that would be permitted under such an agreement, resulting in appellants' rejection of the compromise and the trial court's deci-

sion to permit the witnesses to be called in open court.

■ The trial court appropriately conducted the hearing for the witnesses outside the presence of the jury. It is improper to call a witness before a jury for the sole purpose of having the witness assert a Fifth Amendment right and refuse to testify. Annotation, 19 A.L.R.4th 368, § 11 (1983). When it was established at the hearing in chambers that the witnesses would exercise their Fifth Amendment privilege, they should not have been called before the jury. If there were issues to be settled with the prosecuting attorney and defense counsel about the scope of closing argument, those issues should have been addressed by court directives to counsel not to raise the matter in argument, by instructions to the jury if that became necessary, and by contempt citations if appropriate. The court declined this course of action.

The prosecution then, after two days of extensive testimony regarding the business practices of Keeler Konstruction and introduction of circumstantial evidence to show the involvement of Alan Keeler and Nancy Haefner–Keeler in the underlying conspiracy, called Keeler and Haefner to the stand. Each witness called by the prosecution invoked the Fifth Amendment. After the invocation of their privileges not to testify, the district court gave the following instruction:

> "THE COURT: Ladies and gentlemen of the jury, you are instructed that certain people who have been called as witnesses have invoked their privilege which is provided for by law not to testify in this case. You should not draw any inference at all as to the guilt or innocence of Dale Jones and/or Ray Knox from the fact that these other people who are not charged with a crime invoked their right to remain silent."

Appellants reasserted their pretrial objections on the grounds that calling these witnesses prejudiced appellants in the mind of the jury. The trial court overruled their objections.

In *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the United States Supreme Court established the standards to be applied to situations where it is suspected that key witnesses will refuse to testify when called. In analyzing this issue, the Court remarked that traditionally lower courts have

> "looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. * * * A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet,* 373 U.S. at 186–87, 83 S.Ct. at 1154–55.

Under *Namet,* each case is determined upon its own merits and peculiar facts.

■ Upon examination of the two alternative grounds of error presented in *Namet,* we discern a number of factors to be considered in such a determination. First, we must consider the extent to which the prosecutor called a witness solely for the improper purpose of prejudicing the defendant through adverse inferences drawn from the witness's refusal to testify. Related to this inquiry is the degree of his certainty that such a witness could validly exercise his Fifth Amendment privilege and that he, in fact, intended to assert that right. We must also consider the extent to which the prosecutor made further conscious use of those adverse inferences in the presentation of his case. Finally, we must determine whether the actual use of those inferences added critical weight to the State's case, as it would, for example, where the challenged inferences provided the only corroboration for the dubious and interested testimony of the prosecution's

chief witness. *Namet* at 187, 83 S.Ct. at 1155.

The facts of *Namet*, when analyzed according to these criteria, clearly required the affirmance of Namet's conviction. In that case, the witnesses who exercised their Fifth Amendment privilege had pled guilty to charges of accepting illegal wagers. The prosecution therefore correctly believed that they could not validly exercise that privilege with respect to those charges and called them for the proper purpose of corroborating, through such nonprivileged testimony, the government's case against Namet. Though the trial court eventually ruled that the witnesses, who were still subject to prosecution for conspiracy, could exercise their Fifth Amendment rights with respect to such prospective charges, the Supreme Court found the prosecutor had called the witnesses in good faith. Additionally, the Court found that the inferences from the witnesses' invocation of the privilege lent little to the government's case. Evidence gained from a search of Namet's home and the testimony of federal agents who had him under surveillance for over a month provided strong proof of his bookmaking activities. Thus, no critical weight was added to the government's case by the witnesses' refusal to testify. *Namet* at 188–90, 83 S.Ct. at 1155–57.

The Court reached a contrary conclusion, however, in the later case of *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). In that case, the prosecution called a witness who had previously been convicted of the same crime for which Douglas was charged, under the belief that his conviction would prevent him from invoking his Fifth Amendment privilege. When the witness refused to testify, the prosecutor obtained permission to treat him as a hostile witness and questioned him about his purported confession which implicated Douglas in a shooting. The Court stated that the witness' refusal to testify, while not technically testimony, might lead the jury to draw improper inferences regarding Douglas' guilt. Because those inferences provided the only corroboration of the truth of the self-serving confession, and because that alleged confession was the only direct evidence of a fundamental element of the government's case against Douglas, the Court held that the inferences added critical weight to that case. Because Douglas could not challenge the truth of those inferences by cross-examination of either the witness himself or the police officers who corroborated his making of the purported confession, the Court held that Douglas had been unfairly prejudiced by the denial of his constitutional right to confrontation. Id. at 419–20, 85 S.Ct. at 1077–78. Thus, the Court reversed Douglas' conviction, despite the absence of prosecutorial misconduct, solely on the basis of the "critical weight" factor articulated in *Namet*.

This court's first opportunity to consider the *Namet* problem arose in *Hopkinson v. State*, 632 P.2d 79 (Wyo.1981). We concluded that, on the basis of the unique facts of that case, Hopkinson's conviction should be affirmed despite a witness' invocation before the jury of his Fifth Amendment privilege, and despite the prosecutor's knowledge that he would exercise that privilege. Applying the criteria of *Namet* to that case, it is evident that no prosecutorial misconduct occurred in calling John Suesata. His attorney admitted that Suesata might provide some non-incriminating information to the prosecution. Id. at 141. Therefore, we could not say that the prosecutor called him solely for the improper purpose of taking advantage of inferences from his refusal to testify. Furthermore, we expressly found that the prosecutor made no improper use of Suesata's refusal during the remainder of the trial. Id. at 144. Neither did inferences from Suesata's invocation of his Fifth Amendment privilege add critical weight to the State's case, as per *Namet* and *Douglas*. Shortly before Suesata was called, Hap Russell testified that he and Suesata had been involved in purchasing perjured testimony for Hopkinson. The State theorized, however, that they had actually been arranging the murder of Jeff Green. Id. at 141. It is obvious, with respect to Hopkinson's involvement in that murder, that Suesata's refusal to testify served to corroborate Russell's

exculpatory testimony at least as strongly as it corroborated the State's theory. The very ambiguity of the inference to be drawn from that witness' appearance prevents it from adding critical weight to the prosecution's case. Therefore, our decision in that case was consistent with the criteria set out in *Namet* and *Douglas*.

Our more recent cases are also consistent with those criteria. In *Haselhuhn v. State*, 727 P.2d 280 (Wyo.1986), and *Prime v. State*, 767 P.2d 149 (Wyo.1989), which arose from separate trials relating to the same armed robbery, the State subpoenaed each defendant to testify at the other's trial. Prior to Haselhuhn's trial, as was the practice of the court, all witnesses were sworn at one time in front of the jury. Prime took that opportunity to volunteer his intent to exercise his Fifth Amendment privilege. *Haselhuhn*, 727 P.2d at 283, 287. At Prime's trial, on the other hand, Haselhuhn waited until the State called him to testify before refusing to testify. *Prime*, 767 P.2d at 151–52. In their respective appeals, both men asserted that they had been prejudiced by the other's invocation of the Fifth Amendment in the presence of the jury. We did not provide, in either of these cases, a detailed factual analysis which referenced the Namet criteria. Nonetheless, it is evident upon a review of those cases that the analysis of *Namet* and *Douglas* is as consistent with our affirmance of those convictions as it is with our reversal of the present case. In *Haselhuhn*, the prosecutor had no way of knowing that Prime would exercise his Fifth Amendment privilege in front of the jury prior to being called to testify. In *Prime*, *Haselhuhn* had been granted use immunity for his testimony, and the prosecutor had no reason to believe that he could thereafter validly assert his testimonial privilege. Id. at 152; see also *In re Contempt of Haselhuhn*, 740 P.2d 387 (Wyo. 1987). Therefore, neither case manifests the type of conscious prosecutorial impropriety which under *Namet* may provide one ground for reversal. Neither can we find evidence that the refusal to testify, in either case, lent critical support to the State. Two victims of the armed robbery positively identified both *Haselhuhn* and *Prime*, and three other witnesses testified that both defendants had made incriminating statements regarding their participation in the robbery. *Prime*, 767 P.2d at 150–51; *Haselhuhn*, 727 P.2d at 282–83. It is inconceivable, in the face of such evidence, that either man could have been unfairly prejudiced by inferences from his cohort's refusal to testify.

We regret that same conclusion cannot be reached in the present case. Here, the prosecution was aware that Keeler and Haefner could validly invoke their Fifth Amendment privilege and that they fully intended to do so. Furthermore, the improper inference to be drawn from their refusal to testify clearly was critical to the prosecution's case according to the standard of *Namet* and *Douglas*. Their exercise of the Fifth Amendment privilege created an inference of the witnesses' involvement in a conspiracy to murder Vigil. That inference was the only corroboration for the dubious and self-interested testimony of Young, the State's only witness to the existence of such a conspiracy.

Under the circumstances of this case the invoking of the Fifth Amendment in the jury's presence by Keeler and Haefner, who the jury at least suspected to be alleged co-conspirators with appellants in the attempted murder, was too strongly prejudicial to be overcome by a cautionary instruction. We cannot consider this error harmless. The jury could easily have inferred, and the only purpose this testimony could have served was to demonstrate, that the witnesses were invoking the Fifth Amendment because they were guilty of the underlying conspiracy. This inference was necessarily transferred to appellants. The probability that the jury could reasonably infer an admission of guilt through a transfer process to appellants is highly prejudicial. Because of the extreme probability of transference, the calling of Keeler and Haefner added critical weight to the prosecution's case by creating the quintessential inference of guilt not clearly elicited through other testimony at trial. Error is present under the Namet factors, and re-

versal is required. While there may be cases in which a cautionary or curative instruction will suffice to repair the damage done by such testimony, this is not such a case. The trial court had decided before the witnesses took the stand to instruct the jury to disregard the witnesses. The witnesses were called and asserted their Fifth Amendment privilege. The court then instructed the jury to disregard and draw no inferences from the witnesses' invoking their Fifth Amendment privileges. It is suggested that we approve the procedure because it was essential to the prosecutor's case and because the error was harmless. The most popular course might be to accept the suggestion and affirm each conviction. We cannot, in this case, opt for this disposition. With respect to the threat of defense counsel arguing absence of the witnesses to the jury, that is easily avoided by a motion in limine.

It is regrettable that these defendants must be tried again. But, if the case is as strong and the defendants as guilty as the dissent concludes, there should be little difficulty in obtaining convictions again, this time lawfully. Discussion of other issues raised by the parties is unnecessary to our decision, and we decline the invitation to resolve those issues.

Reversed and remanded.

GOLDEN, Justice, dissenting.

"As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674, 684 (1986).

It is this statement by the United States Supreme Court that causes me to dissent to the majority opinion in this case. The statement embodies the legitimate caveat to the laymen's perception that any technical error occurring at trial is per se reversible. In *Chapman v. State of California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967), the Court rejected the argument that all constitutional errors, regardless of their nature or the circumstances of the case, require reversal of a

judgment of conviction. The Court concluded that there are "some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman*, 386 U.S. at 22, 87 S.Ct. at 827, 17 L.Ed.2d at 709. I believe this is just such a case.

Conceding the existence here of an error of constitutional magnitude, I believe *Chapman* instructs that the inquiry does not end with that concession. The question that must next be addressed in the appellate analysis, and a question that the majority essentially ignores, is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," or whether the error can be declared to be "harmless beyond a reasonable doubt." *Id.*, 386 U.S. at 23, 87 S.Ct. at 827, 17 L.Ed.2d at 710 (citing *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173 (1963)). This question is asked keeping in mind that errors affecting the substantial rights of a party will not be considered harmless. *Id.* "[T]here are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." *Id.* See e.g. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963) (right to counsel); *Payne v. State of Arkansas*, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confession); and *Tumey v. State of Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge). Yet the constitutional right infringed upon in this case is not in the same class as those considered in *Gideon*, *Payne*, and *Tumey*. The right granted by the Sixth Amendment to confront the witnesses against oneself does not invite such stringent per se reversible error protections. The right "is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. State of Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1046, 35 L.Ed.2d 297, 309 (1973).

"Since *Chapman*, the Court has made clear that it is the duty of the reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hasting*, 461 U.S. 499, 508–09, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106 (1983) (finding harmless beyond a reasonable doubt prosecution's improper comment on defendant's silence). In *Busby v. Holt*, 771 F.2d 1461 (11th Cir.1985), where the prosecution called a witness that it knew would exercise his privilege not to testify, the United States Court of Appeals for the Eleventh Circuit affirmed the defendant's conviction, listing several factors to be considered in the analysis of harmless error when applying the *Namet* standard. *Namet v. United States*, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). The factors include:

> (1) the prosecutor's intent in calling the witness; (2) the number of questions asked that elicit an assertion of the privilege; (3) whether the adverse inferences drawn from the assertion of the privilege relate to central issues or collateral matters; (4) whether the inference is the only evidence or is merely cumulative of other evidence; (5) whether the witness is closely associated with the accused; (6) whether defense counsel objects; (7) whether the prosecutor attempts to draw adverse inferences from the witness' refusal to testify in his closing argument; (8) whether defense counsel has relied on the assertion of the privilege; and (9) whether the trial judge gives a curative instruction.

*Busby*, 771 F.2d at 1468–69. The United States Supreme Court noted a similar list of factors to consider in the harmless error analysis including the importance of the witness' testimony in the prosecution's case, whether the testimony is cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1436, 89 L.Ed.2d at 686–87.

With these factors in mind, my close reading of the present record reveals a case where the harmless error rule should have been applied to affirm appellants' convictions. Mr. Young's testimony fingering both Knox and Jones satisfies me that the prosecution's case achieved critical mass for the jury to convict appellants without the majority's supposed "transference of an inference" from Keeler's and Haefner's invocations of the privilege. Before Keeler and Haefner were called to the witness stand, the State had presented several witnesses whose testimony related to Keeler's company's unusual business practices. Ray Young, the contract killer, testified after they were called that Knox told him that Keeler's company was being blackmailed; that Knox hired him to kill the alleged blackmailer Vigil; that Jones picked him up in the airport and took him to the house where Vigil would be and gave him the gun to be used. Other testimony established that Haefner owned the gun. There was also testimony identifying Jones as the person who purchased Young's airplane ticket. After Keeler and Haefner were called, the court properly gave a cautionary instruction to the jury advising it that it should not draw any adverse inferences of appellants' guilt from the witnesses' invocation of the privilege.

To my satisfaction, the jury could reasonably conclude beyond a reasonable doubt that Knox and Jones conspired to kill Vigil from the evidence received regardless of the calling of Haefner and Keeler. Moreover, any prejudice created by their being called was avoided by the giving of the cautionary instruction. *Prime v. State*, 767 P.2d 149, 152 (Wyo.1989) (citing *Labbe v. Berman*, 621 F.2d 26 (1st Cir.1980) and *United States v. Watson*, 591 F.2d 1058 (5th Cir.1979) cert. denied 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1070 (1979)). The calling of Keeler and Haefner and their subsequent invocations of the Fifth Amendment privilege were, at most, cumulative evidence of appellants' guilt already firmly established by other competent evidence. Being cumulative, its introduction was harmless beyond a reasonable doubt, and should not be used here to reverse an

otherwise valid conviction. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1436, 89 L.Ed.2d at 686.

It is also significant to note that the prosecution did not make any further use of the witnesses' invocations of the privilege, unlike the situation in *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). There, the prosecutor, although not using the witness' invocation of the privilege improperly, told the jury in closing "You saw him [the witness]. You at least got to look at him." *Hopkinson,* 632 P.2d at 144. *Hopkinson* was a case of first impression in this state and recognized *Namet* as the "lodestar" on this issue. *Hopkinson,* 632 P.2d at 142. *Hopkinson* was faithful to *Namet,* acknowledging that "each case should be analyzed on the basis of its own facts." *Hopkinson,* 632 P.2d at 144. In *Hopkinson,* this court found no error when the prosecutor called a witness in the presence of the jury who he *knew* would take the Fifth Amendment. Curiously, the court did not overturn Hopkinson's conviction on facts that were clearly more egregious than the facts here with appellants. In *Hopkinson* the prosecutor refused, as a tactical maneuver, to reveal in advance what questions he intended to ask of the witness, who, based on prior testimony of other witnesses, was established as a central character in the case; consequently, the witness' attorney indicated in chambers that his client would probably invoke the Fifth since he did not know what the questions would be. *Id.* at 141. On appeal this court treated the case as one in which the prosecutor knew the witness would refuse to answer, yet it found no error. The court based its holding on the importance of permitting the prosecution to call the witness "to demonstrate that it was presenting all the relevant evidence at its disposal. Otherwise the defense could have argued that the State's failure to produce [the witness] meant that no corroboration for its theory would have been forthcoming from his testimony." *Id.* at 144. The similarity of *Hopkinson* to the present case is striking. Here, the state's theory was that Keeler

and his company were being blackmailed by the victim Vigil due to some allegedly illegal business practices. The state produced much evidence relating to the company's illegal business practices; coupled with Young's testimony as to his understanding of the blackmailing, Keeler and Haefner were identified as central characters in the conspiracy to kill Vigil.

In light of the state's theory of the case, the majority's decision prohibiting the calling of Keeler and Haefner effectively ties the hands of the prosecutor, a tying which this court in *Hopkinson* would not permit. In a situation such as the one presented here, where the prosecution agreed to call the witnesses outside the presence of the jury to ascertain whether they would invoke their Fifth Amendment rights, but the defense refused to refrain from commenting in closing on the state's failure to present these witnesses to the jury, an almost insurmountable dilemma is created; the prosecution must decide between causing reversible error by calling the witnesses in the presence of the jury, as the majority posits, or not being able to prove its case against the accused because it appears as if it cannot produce witnesses important to its theory of the case. If this is the conclusion the majority wishes to submit, and it appears that it is, then realistically very few cases involving co-defendants or co-conspirators could ever be proven by the state. I do not think this is the result the majority wishes to create. See *State v. Cota,* 102 Ariz. 416, 432 P.2d 428 (1967) (cited in *Hopkinson,* 632 P.2d at 144) (a case where a witness was called whom the prosecution, prior to calling him, had repeatedly referred to as a co-perpetrator of the underlying crime. Finding no error, the Arizona Supreme Court stated "[f]or the state to have presented its theory without calling [the witness] would have meant leaving an obvious step out of its argument. Then the defense could have argued that the state's failure to produce the alleged accomplice meant that no corroboration for its theory would have come from such testimony. *United States v. Gernie* [2nd Cir.1958, 252 F.2d 664]. * * * [T]he state had the right to show that it was

presenting all the relevant evidence at its disposal in order to prove its theory of the case."). *Cota,* 102 Ariz. at 421, 432 P.2d at 433. If the majority wishes to create such an insurmountable obstacle, then it should create a similar obstacle for the defense in situations such as this by prohibiting it from commenting on the state's inability to produce witnesses who, outside the jury's presence, invoked their Fifth Amendment privilege not to testify. Because I do not believe the majority will create such an obstacle to the defense, it should in all fairness not create one for the prosecution.

This court has consistently followed its holding in *Hopkinson* and that of *Namet,* and has not found error, let alone reversible error, in *Haselhuhn v. State,* 727 P.2d 280 (Wyo.1986), cert. denied, 479 U.S. 1098, 107 S.Ct. 1321, 94 L.Ed.2d 174 (1987) and *Prime v. State,* 767 P.2d 149 (Wyo.1989), published five months ago. In *Haselhuhn,* the defendant's co-defendant Prime was subpoenaed to be a witness at Haselhuhn's trial. Four days before the trial, Prime's attorney notified the court that Prime would invoke the Fifth Amendment as to all questions asked. In accordance with the practice of the court, all witnesses were sworn at the beginning of trial. It was later observed that Prime had not been sworn and the judge directed that the oath be read to him. Although not yet called to testify at that time, Prime indicated that he would invoke his Fifth Amendment right not to testify against himself and would not testify at trial. Haselhuhn asked for a mistrial but did not request a limiting instruction. *Haselhuhn,* 727 P.2d at 283.

On appeal, Haselhuhn argued that his constitutional right to cross-examine witnesses against him came into play when Prime asserted his intention not to testify if called. He stated that Prime's invocation constituted testimonial conduct. In affirming Haselhuhn's conviction, this court placed emphasis on Prime's not actually being called to testify. We stated that "[t]he right of confrontation which is inherent to any fair trial involves cross-examination with respect to testimony that a witness has given. It does not, however, extend to a right to cross-examine a witness who is not called to testify with respect to conduct such as that which occurred in this case. Nothing material to the issues would have been elicited in such cross-examination and the possibility of harm to Haselhuhn would be great indeed."

*Haselhuhn,* 727 P.2d at 286. We further noted that "[w]hile such incidents should be avoided in the trial of a case, this occurrence is not a ground for reversal." *Haselhuhn,* 727 P.2d at 286–87 (citing *Hopkinson,* 632 P.2d 79).

The inverse occurred in *Prime,* 767 P.2d 149. At Prime's trial, evidence was elicited incriminating Haselhuhn in the crime with which Prime was charged. During the course of the trial the prosecution called Haselhuhn as an adverse witness. Having not been sworn, Haselhuhn indicated that he would not be sworn and would not testify; the trial court found him in contempt. Prime moved for a mistrial, which was denied, and the court cautioned the jury that its finding Haselhuhn in contempt was not to have any bearing on the innocence or guilt of Prime. *Id.* at 152. This court found no error, citing *Haselhuhn* as authority for the proposition that while "such incidents should be avoided in the trial of a case" by making the record outside the presence of the jury, "what occurred is not a ground for reversal because, in the context of the trial, this event did not prejudice Prime." *Prime,* 767 P.2d at 152.

In the wake of these two recent cases, the majority's decision in the present cases is unfounded. Its distinction between *Prime, Haselhuhn* and this case, turning on the time of presentation at trial of the invoking witnesses and whether they were sworn as witnesses, is an illogical distinction in light of the presumed concerns to be addressed in prohibiting a prosecutor from calling such witnesses. The supposed adverse inferences to be drawn by a jury from a witness's invocation of the Fifth Amendment are just as great at the beginning of a trial, as in *Haselhuhn,* as they are in the middle, as here, as in *Hopkinson,* and as in *Prime.* I see no reason why this case should be treated any differently

from *Prime, Haselhuhn* and *Hopkinson.* In light of those cases where no error was found, error should not be found in this case. If the majority wishes to create a bright line rule of reversible error any time a prosecutor calls a witness who he knows will claim his privilege not to testify, then it should do so instead of trying to make distinctions between this and the other cases addressing this issue when realistically there are not any true distinctions to be made. Knox and Jones received a fair trial as contemplated by the *Van Arsdall* court. I would affirm.