**Curtis Leslie MONN, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 90–117.**

Supreme Court of Wyoming.

May 24, 1991.

Leonard Munker, State Public Defender, Gerald M. Gallivan, Director, Wyoming Defender Aid Program, and Christopher H. Hawks (argued), Student Intern, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia A. Hackl, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., Theodore E. Lauer, Prosecution Assistance Program, and Lee F. Jantzen (argued) Student Intern, for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

Appellant Curtis Monn was convicted of incest, taking indecent liberties with a minor, and second degree sexual assault. The issue he presents is whether the State, by examination of his wife in eliciting her testimony, improperly put into evidence statements his wife gave to an investigator. Because no challenge to the testimony was made at trial in the form of a proper objection, we examine this case under the plain error doctrine.

We affirm.

Monn states the issue:

"Whether by allowing the recorded statement of previously convicted witness Sarah Monn to be read into evidence the trial court erred and allowed otherwise

inadmissible hearsay statements to be read into evidence before the jury thus violating appellant's Sixth Amendment right of confrontation."

Appellant's convictions arose from incidents with his daughter, PP, in 1984 and with his step-daughter, CGM, from 1987 to 1989. The daughter, PP, was 15 years old when the sexual assault occurred. The sexual assaults against the step-daughter, CGM, began when she was in the third grade and occurred daily.

At trial, both victims testified in detail about Monn's sexual assaults and indecent acts. CGM testified that she was required to sleep with her stepfather Monn and her mother Sarah. She was not allowed to wear underwear to bed. Monn wore only a t-shirt. CGM identified various sexual paraphernalia and described how Monn would use them on her or force her to use them on her mother. She testified that Monn touched her with his penis on her vagina, anus and mouth. She testified that she saw Monn ejaculate and that he had ejaculated into her mouth. Evidence also showed that CGM, Monn, and Sarah Monn had Gardnerella or bacterial vaginitis, a disease sexually transmitted, and that CGM had an enlarged vagina consistent with penetration by an adult male.

PP, Monn's daughter, testified that she went to live with Monn in January of 1984. She was forced to sleep naked with Monn and her stepmother Sarah. Monn forced PP to have oral sex and intercourse with him. She left the house the first chance she had which was a few days later. During May 1989, PP informed the Natrona County sheriff's office that appellant might be engaging in a sexual relationship with his ten-year-old stepdaughter.

On May 11, 1989, Sarah Monn gave a sheriff's investigator a statement recounting the sordid details of Monn's sexual abuse, assaults, incest and intercourse with these young girls. Ten days before trial, Sarah Monn met with the prosecuting attorney and reviewed and reaffirmed her statement preparatory to trial and testifying. And so Sarah Monn was also called as a witness for the State. She testified that she had been imprisoned for incest. She testified that PP had slept in bed with Monn and herself. Then her memory began to fade. To some questions concerning sexual activity she responded by saying she could not remember; to other questions she responded without equivocation, sometimes contrary to the statement she gave to the sheriff's investigator. For example, she denied that a vibrator was used for sexual purposes. About CGM being told "not to say anything," when asked what CGM said "besides it hurt," Sarah Monn, contrary to her statement, said she did not know. She denied anything else occurred, then admitted appellant "made her [CGM] get down there by my vagina and lick it * * *." When asked about the last time anything happened, she said she did not know, then related the time. She stated that she never touched CGM in a sexual manner nor had CGM touched her in a sexual manner, which was inconsistent with her prior statement. The State's attorney undertook to impeach the witness with her prior inconsistent statements or to refresh her recollection by questioning her about the statements she made to a Natrona County sheriff's investigator on May 11, 1989. In response to the prosecuting attorney's questioning, Sarah Monn read the answers to questions from her statement. Her answers were that she had seen Monn use the vibrator on CGM, and CGM had been forced to use the vibrator on her; that Monn promised CGM candy for engaging in sexual acts; and that the sexual acts hurt CGM.

The only objection interposed by Monn's counsel during Sarah Monn's testimony was the following:

"Q. [By the State]: Why don't you go ahead and read the rest, if you don't remember it, following that what [sheriff's investigator] said?

"[Monn's counsel]: Objection, I am not sure what the question is. Counsel is just going to have her read.

"[The State]: I am sorry, it is on the same line of questioning and what did she say, referring to [CGM] when she said it hurt. What did she say?"

This objection was inadequate to draw the court's attention to a possible hearsay problem. *United States v. Johnson*, 802 F.2d 1459, 1465 n. 14 (D.C.Cir.1986). Due to the absence of an objection adequate to alert the trial court to a problem, the admission of this hearsay must rise to plain error before it will be considered by this court. *Schmunk v. State*, 714 P.2d 724, 739 (Wyo.1986); W.R.E. 103(d); W.R.A.P. 7.05; W.R.Cr.P. 49(b).

▪ To invoke the plain error doctrine, three elements must be established. First, the record must clearly show what occurred at the trial without resort to speculation. Second, the existence of a clear and unequivocal rule of law must have been violated in an obvious way. Third, this violation must have adversely affected some substantial right of the accused. *McLaughlin v. State*, 780 P.2d 964, 971 (Wyo.1989).

▪ We question that even the first element of our plain error doctrine is satisfied, in that what occurred at trial is often not clearly shown. Thus, while the prosecutor's questions and witness Sarah Monn's answers clearly appear in the record, it is often unclear whether the witness was answering the question from her own knowledge and memory, was answering on the basis of refreshed memory, or was reading her answer from her transcribed prior statement which she had before her. The record does demonstrate that Sarah Monn was an uncooperative witness who either did not remember certain events or who blatantly testified falsely that she did not remember statements she had reviewed and affirmed with the prosecuting attorney just ten days earlier. She also testified, contrary to her statement, that no sexual activity involving the victims took place. Her statements to the investigator were used in her examination as prior inconsistent statements, for impeachment, as affecting her credibility, and to refresh her recollection.

We cannot conclude that a clear and unequivocal rule of law was violated in an obvious way as required by the second element of our plain error doctrine. Appellant argues that Sarah Monn's statements to the sheriff's investigator were hearsay and the State did not meet the requirement for admitting the statement under the past recollection recorded exception. W.R.E. 803(5). However, Sarah Monn did not simply state she could not remember anything; she also denied certain sexual activity which was inconsistent with her statements to the sheriff's investigator. Inconsistent statements may be found in evasive answers, the *inability to recall*, silence, or *changes of position*. *United States v. Dennis*, 625 F.2d 782, 795 (8th Cir.1980). Except for silence, Sarah Monn's testimony is characterized by these types of responses. Prior inconsistent statements are admissible under W.R.E. 613(b):

"(b) Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

Sarah Monn did attempt to explain the statements by claiming to have made them under stress. Monn's counsel interrogated Sarah Monn concerning these statements on cross-examination. We cannot say that had Monn's counsel properly brought the issue before the court, he would have not been afforded the opportunity to interrogate Sarah Monn before the statements were read. Thus, we cannot say on the basis of the record that the requirements of W.R.E. 613(b) were not met.

Lastly, appellant's claim that the trial court erroneously permitted the State to put Sarah Monn's prior statement in evidence pursuant to a hearsay exception in W.R.E. 803(5) must fail. Some authority does exist to suggest that past recollections may be admissible under the 803(5) exception when the credibility of a witness's lack of memory is questionable. *United States v. Williams*, 571 F.2d 344, 349 (6th Cir.), *cert. denied* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978); *United*

*States v. Insana,* 423 F.2d 1165, 1170 (2d Cir.), *cert. denied* 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76 (1970). This statement, however, was never offered into evidence pursuant to W.R.E. 803(5), and the requirements of the rule never became a requirement in this case.

We cannot conclude that the use of Sarah Monn's statements to the sheriff's investigator resulted in a violation of a clear and unequivocal rule of law. Finally, we are comfortable in finding that whatever occurred did not affect a substantial right of the accused. Sarah Monn's testimony was confusing at best. Only a very bold person would undertake to say what effect it may have had upon the jury. But more significantly, there was ample other evidence from which the jury found that appellant had committed the crimes of which he was found guilty. PP testified clearly and unequivocally that appellant had taken sexual advantage of her when she was 15 years old. CGM testified at length about appellant's sexual aggression toward her. She testified graphically as to the different tactics appellant used to molest her sexually. Her testimony was corroborated ·by that of nurse Kenna Holman concerning the existence of a sexually transmitted disease in appellant, Sarah Monn, and CGM. Her testimony of sexual assault was also corroborated by Dr. Joanne Hedgecock's testimony that CGM's vaginal opening was abnormally large, consistent with penetration by an adult male, and that CGM's vaginal disease could, to her knowledge, only be transmitted through sexual intercourse. There was not plain error in the examination of Sarah Monn, nor was there prejudicial error in the trial of this case.

Affirmed.

CARDINE, J., concurs.

URBIGKIT, C.J., files a dissenting opinion.

CARDINE, Justice, concurring.

I am compelled now to proceed with a discussion of the inappropriate, improper, and unjustified appellate approach to this case in the dissent and to discuss the pro-priety of going outside the appellate record for evidence and facts, the incorrect statements and application of law, and the unwarranted attacks upon counsel and the court.

Footnote 2 of the dissenting opinion informs us that the dissenting justice has *ex parte* gone outside the record on appeal and taken "judicial notice" of "[t]he criminal file of *State v. Sarah Monn,* Docket No. 40806, Natrona County, Wyoming * * * including specifically the prosecution and district court * * *." W.R.E. 201 provides that "[a] court may take judicial notice * * *." This "court" has never taken judicial notice of matters which the dissent identifies, and I do not believe each justice is privileged to separately undertake his own expansion of a record on appeal.

Even more unprecedented is the fact that the specific documents which were judicially noticed are not presented, identified, marked as exhibits or made part of the record. We were informed that because information "was only a telephone call away," that the dissenting justice effected this judicial notice by telephone—so we have now in this case telephonic judicial notice. But what records were noticed and how—with whom was the telephone discussion? The actual summary in footnote 2 may be accurate or inaccurate. We do not know. The dissenting justice went outside the record, *ex parte*—without informing either counsel—and by telephone he developed his own facts, conducted his own investigation, and added his own development of facts to this appellate record. In *Lawn v. United States,* 355 U.S. 339, 354, 78 S.Ct. 311, 320, 2 L.Ed.2d 321 (1958), the United States Supreme Court stated: "[The court] must look only to the certified record in deciding questions presented."

In *Brown v. Sutton,* 158 Miss. 78, 121 So. 835, 837 (1929), the Supreme Court of Mississippi stated:

"It follows that this court has no power to alter, amend or correct the records of trial courts in respect to the contents or recitals of those records. * * *

"It follows further that this court acts and must act only on the record as it is

certified to us by the clerk of the trial court."

Evidence outside the record does not become part of the appellate record unless made so pursuant to rule in some regular proceeding. *Suydam v. Williamson,* 61 U.S. (20 How.) 427, 15 L.Ed. 978 (1858). Records and evidence in another case cannot be considered by an appellate court unless introduced in evidence or made part of the record in some judicial proceeding. *Damon v. Damon,* 312 Mass. 268, 44 N.E.2d 657, 143 A.L.R. 463 (1942). A telephone call does not satisfy the requirements of this rule. In addition, what occurred here was *ex parte, i.e.,* without notice to any counsel, let alone one counsel.

In *Nuspl v. Nuspl,* 717 P.2d 341, 343–44 (Wyo.1986), Justice Urbigkit, writing for a unanimous court, said:

> "Subsection (d) [W.R.E. 201] also operates to limit judicial notice in that it provides the opportunity for a party to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed.
>
> "Concerning this opportunity for notice, Louisell and Mueller, Federal Evidence § 58, p. 449 (1977) states:
>
> " ' * * * The question always to be answered is whether the court has in fact embodied in its findings or opinion an adjudicative fact not found in or supported by the formal evidence in the case, and if so, whether the fact in question is a fact properly noticeable.'
>
> \* \* \* \* \* \*
>
> " '*A major risk when the trial judge resorts to outside sources to verify facts is that he may choose to decide the whole dispute on the basis of his own independent research. \* \* \* [S]uch procedure should be discouraged, at least until the parties are given ample opportunity to examine the sources in question before the judge formulates his own opinions and to present arguments upon the meaning of such sources and suggest additional sources.' "* (emphasis added)

A judicial proceeding is said to be *"ex parte* when it is taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by, any person adversely interested." Black's Law Dictionary, p. 517 (5th ed. 1979). An *ex parte* investigation is "[a]n investigation conducted about a person who is not personally contacted or questioned." *Id.* at p. 517. The telephone call to develop facts here was clearly not in accordance with established law, was inappropriate, and was *ex parte.*

The balance of the dissent concerns the testimony of a witness (not a party), the witness Sarah Monn. Sarah had pled guilty to a sexual assault crime arising out of the same incidents for which appellant was on trial. She was sentenced, probably as a result of a favorable plea bargain, to two to four years and, at the time of trial, was serving her sentence at the women's prison at Lusk, Wyoming.

The dissent complains that:

> "Nothing in the record reveals an effort by defense counsel to learn whether a statement existed or whether its introduction might be attempted. There was the statement and even a subsequent interview by the *prosecuting attorney* with the witness, but no preliminary objection to introduction was raised nor was any *Denno* hearing on admissibility conducted." (emphasis in original) Dis. op. at p. 1013.

It is not surprising that the record reveals nothing about defense counsel learning of the existence of a statement. It never does. Efforts to know of a statement are not evidence; defense counsel does not testify. Nor is it surprising there was no "*Denno* " hearing with respect to this witness' statement. She is a witness—not a defendant. *Jackson v. Denno,* 378 U.S. 368, 380, 84 S.Ct. 1774, 1783, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964), provides that:

> "A *defendant* objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." (emphasis added)

Sarah Monn was a witness. Often there are 15 to 20 witnesses in a trial. Were a *Denno* hearing required upon the statement of each witness, the trial would become a cumbersome, never-ending circus.

Next it is said:

"The statement was neither marked for identification at trial nor tendered for introduction into evidence." Dis. op. at p. 1013. Again, not surprising. There is no rule of evidence that requires an attorney to mark and tender anything into evidence. What evidence and exhibits should be offered has always been left to trial counsel who decides how best to present and try his case.

Next it is said:

"What we do not know is whether Sarah Monn was ever given a *Miranda* warning before her statements were obtained and specifically what assistance of counsel she had been provided before or after criminal charges had been filed against her." Dis. op. at p. 1014.

Whether Sarah Monn was given *Miranda* warnings is simply immaterial in this case. She is only a witness. *Miranda* warnings are not required before a statement, given by a witness, is utilized. And if a *Miranda* warning was material to the charge filed against Sarah in the State's case against her, it was waived by her favorable plea bargain and guilty plea. So the fact is the *Miranda* warning requirement is not now relevant or material in either case.

Next it is said:

"What distresses me about this record is the abject failure *at this trial* to provide Sarah Monn the opportunity to have the assistance of counsel which she needed to avoid self-incrimination under the Fifth Amendment and Wyo. Const. art. 1, § 11, or to advise her about the privilege held by a wife not to testify against her husband under the statute." (emphasis in original) Dis. op. at p. 1014.

It was unnecessary to advise her of the Fifth Amendment privilege against self-incrimination because she could not incriminate herself. She had already pled guilty to a criminal activity arising out of this incident. Double jeopardy would prevent her from being charged again. And this court has said clearly and succinctly that the wife's privilege not to testify against her husband does not exist in a child abuse case. We have said in *Seyle v. State*, 584 P.2d 1081, 1086 (Wyo.1978):

"In *Chamberlain v. State*, Wyo., 348 P.2d 280 (1960), we held that it is within the purview of our statute [§ 1–142, supra (now W.S. 1–12–104)] that the wife be permitted to testify where she has suffered a special, particular and personal wrong through the rapacious assault upon her child. We reasoned that cases in which there is a wrong against the child of the wife fall within the § 1–142 exception applicable to 'criminal proceedings for a crime committed by one [spouse] against the other' * * *. If we abandoned the construction placed on § 1–142, supra, in *Chamberlain*, we would encourage defendants to silence their spouses in child-abuse or child-homicide cases. This is not the policy of this State."

Next it is stated that "[t]his case provides neither impeachment nor refreshed recollection." Dis.op. at p. 1014. The essence of the claim is that one who says "I don't remember" may not be impeached. Again, a surprising contention. Suppose she is lying when she says she cannot remember. Surely the state attorney can impeach her by showing she is lying. The transcript of testimony attached to the dissent demonstrates precisely that. For example, see the following questions and answers:

"Q. Do you remember anything happening while she was sleeping in your bed?

"A. Not really.

"Q. Do you remember giving a statement before that you remember something happening?

"A. I don't remember.

 * * * * * *

"Q. Didn't you call [Investigator] and tell him what was going on in your house?

"A. No, I don't, I didn't call him, I had talked to somebody else.

"Q. Didn't you call * * * at DPASS?

"A. Yes, I talked to [DPASS personnel].

"Q. And you told her that you had information for her about things that were going on in your house?

"A. Things that I thought were going on.

"Q. In fact things that you were involved in?

"A. Yes.

\* \* \* \* \* \*

"Q. Didn't you give a factual basis to an incest charge that you did those things?

"A. I possibly did.

"Q. Isn't it true that when these things were going on in your house, Curtis was also present with you and your daughter?

"A. Possibly.

"Q. And isn't it true that you saw Curtis Monn and [Curtis's daughter] sexually engaged?

"A. I can't say that I remember that.

"Q. Again did you or did you not give a statement to Investigator * * * and myself about that incident?

"A. I don't remember giving you a statement.

"Q. Did you in response to a question tell me that?

"A. I may have."

From the whole of her testimony, it is apparent that she discussed the case with appellant a few days before trial, that she is lying when she says she does not remember, and that she attempted to influence her daughter's testimony. Thus, she testified:

"Q. Isn't it true that you have been in contact with him [defendant] the last several days?

"A. Very good possibility, yeah.

"Q. And isn't it true that you wrote a letter to your daughter just recently?

"A. Yes, I probably did.

"Q. In that letter didn't you tell her that if she testified Daddy would go away?

"A. Telling her the truth, apparently you didn't take into consideration what else I said to her, did you, I would be happy to tell everybody unless there is something you want to hide from it."

Then the letter was read to the jury. An excerpt from that letter follows:

"Now I hear [the Investigator] talked to you about daddy. He said you wanted to tell everyone what daddy did. You know, if daddy goes to jail, you, [other daughter] and momma [sic] won't be able to ever see or talk to him ever again. Do you really want that to happen[?]"

The dissent objects that "[t]he prosecutor was relentless in ignoring her claim that she did not remember giving the prior statement." Dis. op. at p. 1015. The dissent is correct; he was relentless, and he should have been relentless. A trial is a search for the truth. The truth in this case is that this lady knew exactly what appellant had done to these girls and she tried to hide behind, "I don't remember."

Next it is stated:

"Defense counsel at trial and this court in opinion disregard without reference *Channel v. State*, 592 P.2d 1145 (Wyo. 1979), which clearly determined the scope of admissibility of the proffered testimony here *even if it had been done right* and then, if a limited instruction would have been given, states that '[t]he prior statement of this witness does not qualify for substantive use to prove a fact but only for the limited purpose of impeachment.' *Id.* at 1149–50. Without citing authority, we now *sub rosa* overrule *Channel*, adopt a minority rule without discussion or citation of authority and confuse both the law of refreshed recollection and of impeachment." (emphasis in original) Dis. op. at p. 1014.

This case does not overrule *Channel* nor adopt a minority rule. In *Channel*, defense counsel requested a limiting instruction. It was refused. That was error. In this case, there was no request for a limiting instruction. If requested, it would have been given. Thus, there was no error.

Finally, there are the continuing, appalling attacks on trial and appellate counsel

found in the following statement in the dissent:

"Complete preclusive ineffectiveness in trial preparation and presentation existed and is not presented for this appeal by the appellate student defender counsel in appellate brief writing and, consequently, the majority safely justifies what occurred at trial by absolution and resolution of plain error incantation. *Lozano v. State*, 751 P.2d 1326 (Wyo.1988); *Schmunk v. State*, 714 P.2d 724 (Wyo. 1986); *Jones v. State*, 580 P.2d 1150 (Wyo.1978)." Dis. op. at p. 1014.

I found the brief of appellate defense counsel superior in research, writing and scholarship. Presentation of argument was far above average. Professor Gerald Gallivan, for whom I have utmost respect, is director of the student defender program, and supervises research and preparation of brief and argument and was present at counsel table for oral argument. Both trial and appellate counsel did an admirable job representing this appellant in a case in which there was not much with which to defend. Even the dissent recognizes this fact when it begins by stating "[t]his case presents a sordid scene of parental sexual abuse and misconduct with their children," dis. op. at p. 1011, and concludes by stating "[n]o matter how reasonably assured conviction might have been * * *." Dis. op. at p. 1016. If the conviction was reasonably assured, then at least we ought to accept that what occurred at trial was not prejudicial, *i.e.*, its absence would not change the outcome or result in an acquittal, and there was no error.

URBIGKIT, Chief Justice, dissenting.

This case presents a sordid scene of parental sexual abuse and misconduct with their children. As punishment for her participation, the mother was sentenced to a term in the Wyoming Women's Center. The father, appellant, was sentenced to a term of six to eight years for Count II, a term of four to five years for Count III, and a term of fourteen to sixteen years for Count IV, with Counts III and IV to be served concurrently with each other and served consecutive to Count II. The tragedy revealed in the incestuous family behavior cannot now justify, however, the obvious ineffectiveness of appellant's trial counsel as an issue not presented through ineffectiveness of appellate counsel or the result of totally inappropriate usage of a prior recorded statement of the wife to convict appellant by forcing his wife to read back her statement one question at a time before the jury.

A more effective way to misuse the Wyoming Rules of Evidence than was evidenced here cannot be imagined. Proper trial methods are available, but certainly not demonstrated in this record.[1] I dissent.

In order to set the stage for these most serious criminal proceedings, an understanding of the case development is required—sketchy as the record may be in many details.

The case develops from a June 2, 1989 criminal information filing which claimed criminal sexual abuse of children as charges against the father commencing in 1984 and continuing to May 1989. Appellant Curtis L. Monn, age forty-five, had apparently been arrested in Illinois and extradited to Casper, Wyoming to face the charges. His wife, Sarah Monn, age thirty-nine, had also been charged with sexual abuse offenses, pled guilty, and, at trial

---

**1.** Neither the trial judge nor this court consider any aspects of the Fifth Amendment rights against self-incrimination or the wife-husband privilege provided by W.S. 1–12–101, which states in part:

(a) The following persons shall not testify in certain respects:

\* \* \* \* \* \*

(iii) Husband or wife, except as provided in W.S. 1–12–104[.]

See, however, *Seyle v. State*, 584 P.2d 1081 (Wyo.1978).

time for appellant, was serving a sentence in the Wyoming Women's Center in Lusk, Wyoming.[2] On May 11, 1989, Sarah Monn, in jail after her arrest, had given a state-

**2.** The criminal file of *State v. Sarah Monn,* Docket No. 40806, Natrona County, Wyoming, with which the participants in the Casper trial should have been generally familiar, including specifically the prosecution and district court, which I judicially notice for historical background relative to her continued testimony about the incident, additionally documents:

After a complaint had been filed and a warrant issued against Curtis Monn on May 9, 1989, he was apparently arrested on May 19. A complaint was also issued against Sarah Monn on May 9, which in terminology as with the subsequent information filed on May 25, charged *precisely the same four offenses* which had been filed against Curtis Monn. Sarah Monn was arrested on May 10 and she apparently remained in jail thereafter. Following arrest, she gave an interview on May 11 in the sheriff's office. The Curtis Monn record does not reflect specifically whether it occurred before or after her appearance in county court when she had asked for appointment of counsel, but one would rationally expect that after arrest on May 10 and comprehensive interrogation on May 11, she was first then taken to county court for an opportunity to obtain counsel since she was obviously interviewed without counsel present. *See* attached transcript documentation in *State v. Curtis Monn.*

A representative of the public defender's office in Casper, different from appellant's counsel, was designated to represent Sarah Monn on May 11 by the county court. Following waiver of preliminary hearing, an information was then filed on May 25.

Upon initial appearance in district court on June 9 for arraignment, Sarah Monn pled not guilty and not guilty by reason of mental illness or deficiency and was sent to the Wyoming State Hospital for observation. In their report, a copy of which was furnished to the prosecuting attorney and the office of the public defender, she was found to have mild brain damage, either from developmental delay or heavy drinking—to be mentally ill—but not to have such mental illness that would qualify her for consideration of a legal finding of insanity.

On September 12, a plea bargain was presented to the district court for her to plead guilty to Counts I and III with dismissal of Counts II and IV. On November 9, she was sentenced to the Wyoming Women's Center for a term of two to four years on Count I, a consecutive sentence of one to two years on Count III with the sentence on Count III suspended for a two year probation.

From this current Curtis Monn record involving her husband's trial, we also are informed that Sarah Monn was again interviewed on January 26, 1990 by return to the jail in Casper after being sentenced and sent to the penitentiary. The interview was conducted by the assistant prosecuting attorney and the investigating officer in preparation of the trial of appellant

which commenced February 5, 1990. Obviously, at least as shown by this record, Sarah Monn's attorney was again not present for that interview. These events provide the factual background for her to testify in the prosecution case of her husband on February 5, 1990 when again her counsel was neither present nor consulted as far as the present record and transcript reveals.

The telephone call to which Justice Cardine makes reference in the majority—special concurrence—was a call from this office by the judicial assistant to obtain a copy of the formal court record relating to the conviction of Sarah Monn as a co-participant in the identical charged criminal offenses. That record shows date of arrest, arraignment in county court, arraignment in district court, plea and sentence. It also includes medical information obtained regarding her mental condition by report from the Wyoming State Hospital. It does not include any transcript of testimony or indications relative to any action having been taken to suppress the confession which is the present subject matter of the evidence used in this case and attached by appendix to this dissent. The ex parte charge by critical comment of Justice Cardine is summarily rejected as factually untrue and legally invalid since reference in the dissent is made only to historical facts taken from a record where the same district court participated in both cases. W.R.E. 201. The prosecutor was the same and the office of the public defender was involved in both. The real substantive objection which permeates the special concurrence is derived from facts which state what happened as that subject is questioned within the court file regarding the history of the co-actor/wife and now principal witness in her testimony in this case. The Sarah Monn record provides dates and court appearance events which supplement the close and specific examination of the circumstances factually established by the Curtis Monn record now under appellate review. *See* W.R.E. 201; *Weber v. Johnston Fuel Liners, Inc.,* 540 P.2d 535, 538 (Wyo.1975); *Texas West Oil & Gas Corp. v. First Interstate Bank of Casper,* 743 P.2d 857 (Wyo. 1987), *reconfirmed* 749 P.2d 278 (Wyo.1988); *State in Interest of C,* 638 P.2d 165 (Wyo.1981) and *see also Gist v. State,* 737 P.2d 336 (Wyo. 1987).

*See also Sweetwater County Planning Committee for Organization of School Districts v. Hinkle,* 491 P.2d 1234 (Wyo.1971) and *Washakie County School Dist. No. 1 v. Herschler,* 606 P.2d 310 (Wyo.), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980), where this court judicially noticed documented information for opinion recitation.

We do not retry or even reconsider the conviction or sentence of Sarah Monn in this case. We consider here the propriety, approach and appropriateness of the way her testimony was used in this case to convict her husband.

ment to police officials, but probably before she was given any opportunity to secure counsel.

Trial commenced for appellant on February 5, 1990. Sarah Monn, who was serving her sentence in the Wyoming Women's Center, had been brought back as a prosecution witness and was being held in the jail in Casper pending appearance on the witness stand. Whether directly informed or not, appellant's counsel would have cause to have known about the anticipated testimony by check of the record which revealed that the State intended to present Sarah Monn as a witness for prosecutorial evidence. Nothing in the record reveals an effort by defense counsel to learn whether a statement existed or whether its introduction might be attempted. There was the statement and even a subsequent interview by the *prosecuting attorney* with the witness, but no preliminary objection to introduction was raised nor was any *Denno* hearing on admissibility conducted. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Nothing in this record reflects consideration by counsel of the witness privilege under W.S. 1–12–101 or right against self-incrimination under the Fifth Amendment of the United States Constitution and Wyo. Const. art. 1, § 11.

*The statement was neither marked for identification at trial nor tendered for introduction into evidence. It is not contained in this record except for the process used to have Sarah Monn personally read segments to the jury by the prosecutor in her examination. The record further reveals that the interview between the police officer and Sarah Monn was tape recorded and the tape was neither marked as an exhibit nor tendered into evidence.*

Sarah Monn's entire testimony from crude start to absurd finish, as sickening as its text is found to be, is attached as an appendix without deletion. In its course of twenty pages in transcript, one objection was taken which involved and decided without court ruling:

[DEFENSE COUNSEL]: Objection, I am not sure what the question is. Counsel is just going to have her read.

[PROSECUTOR]: I am sorry, it is on the same line of questioning and what did she say, referring to [daughter] when she said it hurt. What did she say?

After Sarah Monn's testimony was completed, the investigating officer was called to testify about the process used for the interview:

Q. Was this information kept in your recorded form?

A. Yes, interview on May 11th was tape recorded.

Q. Have you reviewed that tape, was a transcript made of that statement?

A. Yes.

Q. Have you reviewed the tape and transcript?

A. Yes, I have.

Q. Does it accurately reflect the conversation that you had?

A. Yes, it does.

Q. With Sarah. Is that the same transcript which Sarah Monn was reading from in the courtroom yesterday?

A. Yes.

Q. And were the answers she gave, were the answers she gave to you on May 11th?

A. Yes.

Q. Were you also present when Sarah and I talked about this case on January 26th of 1990?

A. Yes, I was.

Q. How was Sarah acting that day?

A. Fine.

Q. Any sign of duress?

A. No.

Q. Anxiety?

A. No.

Q. Anger?

A. No.

Q. Again did she state the same facts as recited by her in the testimony in the taped transcript as she related yesterday?

A. Yes, she did.

What we do not know is whether Sarah Monn was ever given a Miranda warning before her statements were obtained and specifically what assistance of counsel she had been provided before or after criminal charges had been filed against her. There is nothing specifically found in this record for any adjudication to determine whether what she said was forced, coerced or voluntary and, of course, no finding of voluntariness was asked for or made.

What distresses me about this record is the abject failure *at this trial* to provide Sarah Monn the opportunity to have the assistance of counsel which she needed to avoid self-incrimination under the Fifth Amendment and Wyo. Const. art. 1, § 11, or to advise her about the privilege held by a wife not to testify against her husband under the statute.

Complete preclusive ineffectiveness in trial preparation and presentation existed and is not presented for this appeal by the appellate student defender counsel in appellate brief writing and, consequently, the majority safely justifies what occurred at trial by absolution and resolution of plain error incantation. *Lozano v. State*, 751 P.2d 1326 (Wyo.1988); *Schmunk v. State*, 714 P.2d 724 (Wyo.1986); *Jones v. State*, 580 P.2d 1150 (Wyo.1978).

This case provides neither impeachment nor refreshed recollection. The prosecutor, in a process of testifying himself to establish credibility, forces Sarah Monn to testify against her husband for evidence of his guilt by a non-tendered statement transcribed from a non-offered tape recording. Plain error in conjunction with ineffectiveness of counsel could not be more plainly revealed. W.R.Cr.P. 49(b). *See Schmunk*, 714 P.2d 724 and *Westmark v. State*, 693 P.2d 220 (Wyo.1984).

I dissent because it was improper for the trial judge to allow an alleged prior statement to be read to the jury as testimony when the process used was to neither "refresh recollection" nor to impeach. W.R.E. 612. *See Phillips v. State*, 597 P.2d 456 (Wyo.1979) and *Hernandez v. State*, 587 P.2d 1094 (Wyo.1978). I object because there was never a foundation laid to establish the facts or events of the prior statement, *Mayer v. State*, 618 P.2d 127 (Wyo. 1980); *Epperson v. State*, 600 P.2d 1051 (Wyo.1979), or to provide the best evidence if substantive use was intended. *Phillips*, 597 P.2d 456. Somehow we disregard prior Wyoming case law and ignore a whole squadron of procedural infirmities and improprieties.[3] Defense counsel at trial and this court in opinion disregard without reference *Channel v. State*, 592 P.2d 1145 (Wyo.1979), which clearly determined the scope of admissibility of the proffered testimony here *even if it had been done right* and then, if a limited instruction would have been given, states that "[t]he prior statement of this witness does not qualify for substantive use to prove a fact but only for the limited purpose of impeachment." *Id.* at 1149–50. Without citing authority, we now sub rosa overrule *Channel*, adopt a minority rule without discussion or citation of authority and confuse both the law of refreshed recollection and of impeachment. See, for example, Annotation, *Use or Admissibility of Prior Inconsistent Statements of Witness as Substantive Evidence of Facts to Which They Relate in Criminal Case—Modern State Cases*, 30 A.L.R.4th 414 (1984); Annotation, *Denial of Recollection As Inconsistent With Prior Statement So As To Render Statement Admissible*, 99 A.L.R.3d 934 (1980); and Annotation, *Use of Prior Inconsistent Statements for Impeachment of Testimony of Witnesses Under Rule 613, Federal*

---

**3.** To try a few: a) voluntariness of the statement; b) Miranda; c) W.R.E. 1002—best evidence; d) W.R.E. 803(5)—recorded recollection; e) W.R.E. 801(d)(1)(A)—prior statement of witness is given under oath when used in a criminal proceeding; f) W.R.E. 613—prior statement of witness; g) W.R.E. 612—writing or object used to refresh memory; h) W.R.E. 607—who may impeach; i) W.R.E. 609—impeachment by evidence of conviction of a crime; j) W.R.E.

105—limited admissibility; k) W.S. 1–12–104—husband and wife as witness in civil or criminal case; and finally, 1) impropriety of counsel vouching for credibility by self-testimony in method of examination. Not only the inappropriate inference, but the prejudicial process here used was directly identified and emphatically condemned in *Douglas v. State of Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965).

*Rules of Evidence,* 40 A.L.R.Fed. 629 (1978). *See also* Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence 801(d)(1)(A), 613, and 607,* 75 Mich.L.Rev. 1565 (1977).

The current case law on the new mode of presenting prosecutorial evidence by disavowed statement is near endless, but some standard principles remain. When a witness is unwilling or unable to testify as to the contents of a memorandum, the memorandum is admissible as substantive evidence "if (1) the witness once had knowledge of the contents of the memorandum, (2) the memorandum was prepared by the witness, or at his [or her] direction, (3) the memorandum was prepared when the knowledge of the contents was fresh in the mind of the witness, and (4) the witness is able to swear that he believed the memorandum correct at the time it was made." *People v. Fields,* 151 A.D.2d 598, 542 N.Y. S.2d 356, 358 (1989). *See James v. Com.,* 8 Va.App. 98, 379 S.E.2d 378 (1989). In *Fields,* although the issue was not preserved in appeal, that court reviewed and reversed a trial court's improper use of refreshed recollection under an interest of justice standard. That court indicated it was reversing because the witness was not able to swear he believed the memorandum correct at the time it was made. In that case, the appellant maintained he made the prior statement while under the influence of narcotics and was in fear because of his status as a parolee and asserted he would have told the police anything.

A like circumstance exists here. When asked about the statement, Sarah Monn said "I remember giving something, but the state of mind I was in at the time, I do not recollect what I have said." Despite consistent testimony that she could not swear the memorandum was accurate at the time she gave the statement, the prosecutor continued to question her and then have her read her prior statements into the record. The prosecutor was relentless in ignoring her claim that she did not remember giving the prior statement:

Q. Do you remember giving a statement before that you remember something happening?

A. I don't remember.

\* \* \* \* \* \*

Q. If I showed you a statement would that refresh your recollection?

A. To be perfectly honest with you, no, that wouldn't because what I said when I gave the statement I was under duress. And I am not going to be responsible for what I said.

\* \* \* \* \* \*

A. Didn't you admit to [Investigator] that you did those things?

Q. I don't remember if I did or not.

\* \* \* \* \* \*

A. Again did you make a statement to [Investigator] about the use of that particular vibrator?

A. I don't remember.

\* \* \* \* \* \*

Q. And what did you say?

A. I said, yes, but apparently you haven't recollected that I made a statement that I don't remember what I said, and that I was under duress when this statement was given.

\* \* \* \* \* \*

Q. Do you remember what Curtis would do to get [daughter] to do sexual things with you?

A. I don't recollect. I am sure I will be informed.

And finally, the prosecutor's persistence paid off:

Q. And do you recall the question: When was the last time that something happened between Curtis, yourself and [daughter]?

A. No, why don't you just let me have the statement and ask the question, I will read what you have down there?

At that point, the prosecutor was able to have Sarah Monn actually read the statement to the jury in a manner that allowed that statement to become her trial testimo-

ny.[4] Even though appellant's defense counsel should have pursued a course of vigorous objection to the non-tendered document for which no foundation had been laid, the result is vested in plain error where we have this non-tendered and perhaps inadmissible statement, ineffectiveness of defense counsel,[5] and pro forma testimony of the prosecutor combined to provide substantive evidence of guilt. No matter how reasonably assured conviction might have been, it could have been secured by properly introduced evidence and accepted standards of the presentation of proof.

I dissent.

## APPENDIX

### SARAH MONN'S TESTIMONY

*Direct Examination*

BY [MR. PROSECUTOR]:

Q. Would you state your name and age, please?

A. Sarah Monn, I am thirty-nine years old.

Q. And are you married?

A. Yes, sir.

Q. And who are you married to?

A. Curtis Monn.

Q. How old is Curtis?

A. I think he is forty-five.

Q. Do you know what his date of birth is?

A. 3–22–44.

Q. When were you married to Curtis?

A. Well by law's manner we were married the 23rd of February.

Q. Of.

A. Of '84.

Q. Does that mean you were living with him prior to that?

A. Yes, I have lived with him prior to that, yes.

4. Furthermore, I agree with appellant that this process of engineering improper prejudice against him by the presentation of an uninformed adverse witness is contrary to the basic concept of our recent case of *Jones v. State,* 777 P.2d 54 (Wyo.1989) and, cited therein, *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). *See likewise Douglas v. State of Alabama,* 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), which developed on appeal from a very similar trial process.

5. Appellant developed some fearful appreciation for what had occurred. Shortly after Sarah Monn's testimony had been completed, the following colloquy occurred after evening recess when appellant asked to speak to the judge:

> [DEFENSE COUNSEL]: Mr. Monn has indicated to me this morning before commencement of the trial that he wishes to visit with the Court. I am not real sure concerning what, but his desire to come in and visit before the trial commences.
> THE DEFENDANT: Well, I was told by me [sic] wife that, her words not exactly maybe, but that she had been threatened by the loss of her daughter, and threatened a lot of things, which she is telling me, and I feel that an injustice is being served right now on both parties and I don't feel that things are quite up to par, the way they should be. I don't feel

that I have totally got representation to the fullest.
> THE COURT: It appears to me that your representation has been very adequate, and if you have any problems with any proceedings you should discuss them with your attorney, and I am sure he will take appropriate action.
> THE DEFENDANT: Well, I have asked and told him of people that I have known over the years, people I know, know me. I said I don't remember a lot of things, I don't even remember what I did yesterday for sure, part of it I do and some of it I don't, and I don't feel totally getting [sic] proper representation, while, you see, that I am, I understand that because I have never been in court before, but I don't feel myself that I am getting total representation to the fullest.
> THE COURT: Well, it appears to me that you are, but you should discuss these matters with [Defense Counsel].
> THE DEFENDANT: Well, my wife has told me various things that if she was spoken with by herself, I think, she would probably shed more light on this than I could, because she knows a lot more about it than I do, about what is going on.
> THE COURT: That is something that you should advise [Defense Counsel] of, and he will do what he thinks is proper.
> THE DEFENDANT: That is all that I can do then.
> THE COURT: Yes.

Q. And during that time period where did you live?

A. You want all of the places?

Q. No, during the time period, you were about that time period you were married in February of '84 and prior, just prior.

A. We were living at Scott Hill.

Q. And who also lived there?

A. My daughter.

Q. And what was her name?

A. * * *.

Q. And what relationship is * * * to Curtis?

A. His stepdaughter.

Q. Who is * * *?

A. Curtis's daughter.

Q. Do you remember her coming to the house at Scott Hill?

A. Occasionally.

Q. Did she ever come to stay for a while?

A. I really don't remember that far back.

Q. Do you remember giving a statement to [Investigator] that you remembered that?

A. I remember giving something, but the state of mind I was in at the time, I do not recollect what I have said.

Q. Do you remember talking to me about two weeks ago when you told me you remembered that?

A. Yes, I do remember talking to you.

Q. And do you remember [Curtis's daughter] coming to live with you guys at Scott Hills staying overnight?

A. Possibly, yes.

Q. Where are you residing now?

A. I am a convicted felon, and I have been down in Lusk, I am now incarcerated up here in jail during the trial.

Q. And what are you convicted for?

A. I believe it is called incest.

Q. Do you remember [Curtis's daughter] sleeping in your and Curtis's bed in Scott Hills?

A. Could possibly, yes.

Q. And do you remember why she was sleeping in your bed?

A. Not really, just that she was scared, something had happened to her earlier, and she just wanted to be close.

Q. Do you remember anything happening while she was sleeping in your bed?

A. Not really.

Q. Do you remember giving a statement before that you remember something happened?

A. I don't remember.

Q. Isn't it true that you gave a statement to [Investigator] on May 11th, 1989?

A. Well, I have probably, yes.

Q. And you also remember talking to me approximately two weeks ago of this year?

A. I remember being with you, yes.

Q. Okay. Do you remember what we talked about?

A. Oh, yes, I can remember it.

Q. And what did we talk about?

A. What you talked about was that my testimony was very important to the case, and that if I didn't give a testimony that my husband could possibly go free and how—

Q. Did we talk specifically about your testimony, did I ask you questions?

A. Oh, you asked me quite a few questions, yes.

Q. And did you answer those questions?

A. Well, I probably did.

Q. And what is your answer now to the question, did something happen between Curtis and [Curtis's daughter]?

A. I don't remember.

Q. If I showed you a statement would that refresh your recollection?

A. To be perfectly honest with you, no, that wouldn't, because what I said when I

gave the statement I was under duress. And I am not going to be responsible for what I said.

Q. Your statement to [Investigator] was under duress?

A. Yes.

Q. Didn't you call [Investigator] and tell him what was going on in your house?

A. No, I don't, I didn't call him, I had talked to somebody else.

Q. Didn't you call * * * at DPASS?

A. Yes, I talked to [DPASS personnel].

Q. And you told her that you had information for her about things that were going on in your house?

A. Things that I thought were going on.

Q. In fact things that you were involved in?

A. Yes.

Q. Okay, and what things were you involved in?

A. Oh, I supposedly had touched my daughter, but the way it is stated I don't remember doing it.

Q. Didn't you admit to [Investigator] that you did those things?

A. I don't remember if I did or not.

Q. Didn't you give a factual basis to an incest charge that you did those things?

A. I possibly did.

Q. Isn't it true that when these things were going on in your house, Curtis was also present with you and your daughter?

A. Possibly.

Q. And isn't it true that you saw Curtis Monn and [Curtis's daughter] sexually engaged?

A. I can't say that I remember that.

Q. Again did you or did you not give a statement to Investigator * * * and myself about that incident?

A. I don't remember giving you a statement.

Q. Did you in response to a question tell me that?

A. I may have.

Q. What do you remember about you and Curtis and your daughter being together in your bedroom?

A. I really don't remember.

Q. Hand[ ]ing you what I have marked State's Exhibit No. 1 for identification, do you recognize this?

A. Yes.

Q. What is that?

A. That is what they call a massager or vibrator.

Q. And how do you recognize it?

A. I used it when I was giving massages on my back or had my husband give me a massage.

Q. Was it also used in any sexual connotation, any sexual relations?

A. No.

Q. It never was?

A. No.

Q. Again did you make a statement to [Investigator] about the use of that particular vibrator?

A. I don't remember.

Q. Let me refer your attention to page 8 and an asterisk by initials DT standing for [Investigator] and your initials SM for Sarah Monn, did [sic] you read the question [Investigator] gave you?

A. Had you seen Curt use the vibrator on [Sarah's daughter]?

Q. And what did you say?

A. I said, yes, but apparently you haven't recollected that I made a statement that I don't remember what I said, and that I was under duress when this statement was given.

Q. Isn't it true that you contacted the authorities to come talk to you about these things?

A. I probably did.

Q. Isn't it true you also told me the exact same thing two weeks ago?

A. I don't recollect that I said that, no.

Q. When did you move into 4260 and a half Dodge Street?

A. I believe it was April of 1986.

Q. And was that a trailer house or a house?

A. It is a trailer.

Q. And how long did you live there?

A. I have lived there until, '86 until I was incarcerated in '89.

Q. Who else lived there?

A. My husband, my daughter * * *, and then an[ot]her daughter that I gave birth to by the name of * * *.

Q. And who is * * * father?

A. Curtis.

Q. Was—how do you refer to [Sarah's daughter].

A. * * *.

Q. Was [Sarah's daughter] involved in sexual acts with yourself or with Curtis or both?

A. I don't really know that she was in sexual acts with either of us.

Q. Do you remember giving a statement to [Investigator] in May of '89 about that question?

A. Well, I am sure I did.

Q. And do you remember telling me the same thing two weeks ago?

A. Well, probably.

Q. Do you remember telling [Investigator] about how many times this happened at your house between you and Curt and [Sarah's daughter].

A. I can remember what I was told that I said, yes.

Q. What you were told that you said?

A. Yes.

Q. And who told you that?

A. [Investigator] and you.

Q. Isn't it true we asked the questions and you answered them?

A. I don't deny that.

Q. And do you remember asking the question how old she was when these things started to happen?

A. No, I don't.

Q. Then I will refer your attention to that statement that you gave to [Investigator] on May 11, 1989. [Investigator] stated: Do you remember what grade [Sarah's daughter] was in when this started, and what did you answer?

A. According to this I said seven years old.

Q. Do you remember what Curtis would do to get [Sarah's daughter] to do sexual things with you?

A. I don't recollect. I am sure I will be informed.

Q. On top of page 7 of the same statement says, Dad promised her candy. Did he follow through and give her candy, and what did you respond?

A. Oh, yeah.

Q. How often would this happen, do you remember how often this would happen?

A. No, I don't.

Q. Do you remember in response to: How often this would happen by [Investigator], what your response was?

A. Huh. That is interesting, according to what you have down here I said, it seems like it would happen just about every other day.

Q. And do you recall the question: When was the last time that something happened between Curtis, yourself and [Sarah's daughter]?

A. No, why don't you just let me have the statement and ask the question, I will read what you have down there?

Q. And I will refer you to page 7 and your response.

A. What do you mean, responding to?

Q. Where the asterisk is, when was the last time this happened?

A. It says, I don't really know because I was working nights and from what I was informed, if you will see, I said informed from yesterday from [Sarah's daughter] that he did it when I was at work. I have no idea when the last time was. He could have done it the last night he was with her.

Q. What about the last time all three of you were involved?

A. I don't know.

Q. You recall giving the statement to [Investigator] and what your response was?

A. Well, let's see, it says here the last time all three of us were involved that was, I would say, a good three or four months.

Q. In relation to sexual activities between Curtis and [Sarah's daughter], the question by [Investigator]: Did [Sarah's daughter] ever say that it hurt? Do you recall what you, do you recall if [Sarah's daughter] ever said it hurt?

A. Well, if she is like her mother she probably said, yes.

Q. You don't recall what the statement was, Have you ever heard [Sarah's daughter] say it hurts?

A. I can't recollect that I have.

Q. Again I will refer your attention to page 7, the response to that question by [Investigator]?

A. I heard her a couple of times say it did. Let me have this so I can refer to the stuff that you are asking me the questions and bring it back to me.

Q. Why don't you go ahead and read the rest, if you don't remember it, following that what [Investigator] said?

[Defense Counsel]: Objection, I am not sure what the question is. Counsel is just going to have her read.

[Mr. Prosecutor]: I am sorry, it is on the same line of questioning and what did she say, referring to [Sarah's daughter] when she said it hurt. What did she say?

Q. What did she say besides it hurt?

A. I don't know.

Q. On the statement to [Investigator], do you recall that?

A. She told Dad to stop because it was hurting her.

Q. Okay.

A. Huh?

Q. And in response what would he say when [Sarah's daughter] told him it hurt?

A. I don't know, I suppose anybody would respond.

Q. Do you recall him saying anything when [Sarah's daughter] told him it hurt and to stop?

A. No, I don't.

Q. Again I refer your attention to the top of page 8, what is your response at that time?

A. Gee, I didn't know, he would get mad and say the hell with you, and he did, sometimes he would pull away from her and just roll over and say to hell with you, and other times he would say I am not hurting you and not quit doing it until he decided to quit.

Q. Did Curtis ever tell [Sarah's daughter] not to say anything about what was going on in the home?

A. I don't know. You would have to ask him.

Q. Do you recall telling [Investigator] that you recall the statement by Curtis telling [Sarah's daughter] not to say anything?

A. Not really.

Q. In response to the question: Did he ever say anything to her about her telling or not telling anybody, what was your response?

A. Why can't somebody else read this— where am I reading this at? Yes, he did, he said if anybody ever asks you any questions, say nothing is going on.

Q. Okay. Did [Sarah's daughter] ever do anything to you, with you?

A. Yes, I suppose she did.

Q. Can you tell us what that was?

A. Not really.

Q. Do you recall [Sarah's daughter] doing anything, touching you in private areas?

A. Oh, she touched me in private areas, but—

Q. Do you recall touching her in private areas?

A. Well, naturally, I have given her baths and things.

Q. Beyond that, in a sexual capacity, sexual relationship?

A. I wouldn't say sexual relationship, no.

Q. Okay. Again do you recall making a statement to [Investigator] on May 11th as to the question: When these things were happening, did [Sarah's daughter] ever do anything to you?

A. A few times, yes.

Q. In response to the question: What was that, what was that?

A. Let me read it. Oh, let's see. A few times, yes.

Q. What was that?

A. Oh, her dad would have her put the vibrator on her hand and stick her hand up inside my vagina and then he started out putting the vibrator on my vagina, and she was doing this, you know, touched here in areas on me, it would get me excited, and then he had me holding the vibrator, when he had her do that to me, and he would sit there and he would watch. That don't make much sense.

Q. Did [Sarah's daughter] ever do anything else to you?

A. No.

Q. Again referring to your statement.

A. No, she never did that, she has never done that.

Q. Okay, let's go on and see what else did he do, go ahead and read that.

A. He made her get down there by my vagina and lick it a few times. Huh.

Q. And in response to the questions, what would Dad or Curtis's reaction be when he would have the two of you doing things to each other, how would he react?

A. I don't know. Let me read it off my statement. Well, it would look like he was getting a thrill out of it, you know, it kind of turned it [sic] on or something, and he would just sit there and he would just really, I mean, he just literally have his eyes glued. A couple of times I found him stroking himself, to himself up and it is, oh, brother, I ain't never seen him stroke himself.

Q. And how many times did these things happen when you and Curtis and [Sarah's daughter] were together?

A. Oh, we have always been together.

Q. How many times did these sexual relationships, did this happen when the three of you were together?

A. Gee, I don't know, I don't recollect.

Q. Could it have happened twenty times?

A. I don't know. I wouldn't think so.

Q. Do you recall giving Investigator * * * some answer to that question, could it have happened twenty times?

A. Well, I suppose, I know what was said on there.

Q. And what did you say?

A. Well, what I said and what is on there is not—

Q. This is not the same as what you said. Wasn't this tape recorded at your house?

A. At my house, not that I know of.

Q. I am sorry, tape recorded at the sheriff's office?

A. We had a tape running, yes.

Q. Isn't it true that you are afraid of Curtis?

A. No, I am not.

Q. Didn't you tell Investigator * * * that you were afraid of Curtis?

A. I am always afraid of any man, it doesn't matter if it is Curtis or whoever it is, I am.

Q. Didn't you tell me two weeks ago that you were afraid of Curtis?

A. I don't recollect that.

Q. Isn't it true that you have been in contact with him the last several days?

A. Very good possibility, yeah.

Q. And isn't it true that you wrote a letter to your daughter just recently?

A. Yes, I probably did.

Q. In that letter didn't you tell her that if she testified Daddy would go away?

A. Telling her the truth, apparently you didn't take into consideration what else I said to her, did you, I would be happy to tell everybody unless there is something you want to hide from it.

The Witness: Your Honor, could I see what I said in the letter?

The Court: No, just answer the question.

Q. The things you told Investigator * * *, didn't you also tell me two weeks ago?

A. No, I don't believe I did.

Q. Investigator * * * was present.

A. Yes, he was present.

Q. I do have the letter that you wrote to [Sarah's daughter] last week. I believe that is the case, could you tell me what this is?

A. What do you mean tell you what it is?

Q. What is that?

A. It is a letter to my daughter.

Q. And here is your chance, why don't you read it?

A. Dear [Sarah's daughter]: Hi, sweetheart. How are you doing? Sure do miss you, baby. How's your ears, keeping good care of them, don't let them get infected. Now I hear [Investigator] talked to you about daddy. He said you wanted to tell everyone what daddy did. You know, if daddy goes to jail, you, [other daughter] and momma won't be able to ever see or talk to him ever again. Do you really want that to happen. Hey, momma loves you, and I love daddy and [other daughter]. I don't like to see us all not together, but it is your choice, you are old enough to make up your own mind. Baby, if you go through with telling on daddy don't be upset and afraid that momma will be angry with you. I won't. You have to decide on your own. I love you, Honey, hope you are doing okay, and hope I get to see you real soon. Hope I get to talk to you today too always remember when you are sad and you feel all alone, go to your room by yourself and talk to Jesus. He may not talk to you like you think, but he does listen, and he will answer in his own way. Believe in him, baby. Jesus loves you, you love him with all your heart, soul and mind, he will never, never leave you, baby. Daddy and * * * love you very much, and I know you want us all together right? Well, Hon, I got to write to * * * now, so be happy and keep your grades or keep your grades, you can do it, you are smart, and you know it, don't you. God bless you my precious daughter. Love always, Mom.

Q. Who is * * *?

A. Ou[r] daughter * * *.

Q. Sarah, have you always been there for you daughter?

A. I always have.

Q. Are you there for her now?

A. Oh, yes.

Q. Then why didn't you protect her?

A. I protected her.

[Mr. Prosecutor]: Nothing further.

*Cross Examination*

BY [DEFENSE COUNSEL]:

Q. Mrs. Monn, you have been reading through, I guess, a statement [Prosecutor] has been handing you.

A. Yes, sir.

Q. Do you recognize that statement, do you recall those conversations?

A. No, sir, I don'[t] recall what I have said, I was very upset and very much distressed.

Q. How many different times have you met with [Investigator]?

A. I would say at least four.

Q. Are you aware if any of the other conversations were tape recorded when you met with him?

A. No, I don't, sir, they might have been.

Q. Do you specifically recall [Curtis's daughter] being over to your house on Scott Hills?

A. She came over and visited us occasionally, yes.

Q. Do you recall her spending the night?

A. She has spent nights, several times, sir.

Q. Do you recall being in bed with [Curtis's daughter] and Curtis Monn?

A. Not really.

Q. Did you ever use that vibrator on your daughter for sexual purposes?

A. No.

Q. The matters in your statement are those truthful matters that you told [Investigator] or not?

A. Like I said several times, at the time I was very upset, I was under duress, they kept asking me questions, and I do not recollect anything or just, they just got me when I wasn't functioning like I should have been.

Q. Has Mr. Monn ever told you that [Curtis's daughter] is his daughter?

A. Yes.

Q. Has he ever questioned whether or not he is the father?

A. No, sir.

Q. Do you know when it was, when you were first contacted by the sheriff's office?

A. What do you mean when first contacted?

Q. Concerning these allegations, when was the first time [Investigator] got hold of you?

A. I don't really remember the exact date, but I think it was just before he talked to me I guess on the 5th of May.

Q. Did he ask any of the similar questions that you have been reading from in the interview?

A. Do you mean, when did he ask me this?

Q. The first time you had contact with [Investigator], did he ask you if there was anything inappropriate going on in the home regarding sexual behavior?

A. I don't remember if he did or not.

Q. What was the purpose of his contact with you then?

A. Well, I guess, because I had supposedly called to talk to him.

Q. Isn't it true that at the time that you gave the statement you were in [the] process of moving to Cheyenne, moving out on your husband?

A. Well, I don't really recollect that I was moving out on my husband, I was going to Cheyenne, yes, but hadn't [sic] intentions of moving out, and I did go to Cheyenne.

Q. That was just a temporary trip down there and you were coming back?

A. Yes.

Q. Did you ever tell your daughter that she wasn't allowed to wear undergarments?

A. No.

[DEFENSE COUNSEL]: I have no further questions.

[MR. PROSECUTOR]: No further questions.

—Witness Excused—